OPINION OF THE COURT
 

 Titone, J.
 

 This dispute has its origin in a series of investigative reports published by defendant New York Times between January of 1985 and February of 1986. The articles in question charged plaintiff, the former Chief Medical Examiner of the City of New York, with having mishandled several high profile cases and having used his authority to protect police officers and other city officials from suspicion after individuals in their custody had died under questionable circumstances. Defendants’ articles spawned four separate criminal investigations into plaintiff’s conduct, each of which terminated with findings that there was no evidence of professional misconduct or criminal wrongdoing by plaintiff. Plaintiff thereafter commenced the present action for libel. The issue at this early, preanswer stage of the litigation is whether plaintiff’s pleadings sufficiently allege false, defamatory statements of
 
 fact
 
 rather than mere nonactionable statements of
 
 opinion.
 
 We hold that plaintiff’s complaint, which encompasses actionable assertions of fact as well as nonactionable opinions and conclusions, is sufficient to withstand a motion to dismiss under CPLR 3211 (a) (7).
 

 I.
 

 Plaintiff’s 59-page complaint cites essentially eight "false and defamatory” articles as the basis for his libel action. The first article in the series, which was published on January 27, 1985 under defendant Philip Shenon’s byline, was entitled
 
 Chief Medical Examiner’s Reports in Police-Custody Cases Disputed
 
 and had, as a subheadline,
 
 Cover-Ups Charged in Autopsies in Some Deaths
 
 — Gross
 
 Denies Misleading in Any Instance’.
 
 The opening two paragraphs asserted that, as the City’s Chief Medical Examiner, plaintiff had "produced a series of misleading or inaccurate autopsy reports on people who died in custody of the police, according to colleagues in the Medical Examiner’s office and pathologists elsewhere.” Further, according to the article, plaintiff had "instituted a policy of special handling for police-custody cases,” had "per
 
 *150
 
 formed the autopsies himself’ in many such cases and "[i]n others, documents show[,] he intervened to alter the findings of other pathologists.” What follows is a series of assertions about plaintiffs actions in connection with several specific cases, including that of "a Brooklyn man who neighbors say was beaten by police officers” and that of Eleanor Bumpurs, "the 66-year old Bronx woman who was shot to death * * * by police officers trying to evict her.”
 
 [1]
 

 The article, which also discussed the purported disarray in the Medical Examiner’s office, reported on interviews conducted with several pathologists, who both described and characterized plaintiffs specific actions in relation to cases handled by the Medical Examiner’s office. One pathologist who had worked with plaintiff asserted for example, that, in the case of the man who had allegedly been beaten by the police, plaintiff had changed the autopsy findings to state that death had resulted from a procedure performed by doctors after the incident rather than from a fractured skull. The pathologist was then quoted as asserting: "What Gross has done is bend over backwards to help the police” and "[i]t’s weaseling.” Another pathologist, who had not worked with plaintiff but who had been asked to review some of the disputed autopsy findings, was quoted as saying: "If he did these cases honestly, Dr. Gross is unbelievably incompetent”; "[i]f he has done this deliberately — and I believe he has — he may well be looking for a way out for the police.” The tenor of the other articles cited in plaintiffs complaint was similar, with quotes from documents and individuals describing plaintiffs specific actions, disagreeing with his medical conclusions and drawing conclusions about his motives. The over-all thrust of the series was that plaintiff had issued false or misleading reports about deaths occurring within his jurisdiction in order to protect the police and that his conduct ranged from "highly suspicious” (article published Feb. 5, 1985) to "possibly illegal” (article published Jan. 28, 1985).
 

 Before discovery had begun, defendants moved to dismiss the libel claims in plaintiffs complaint, arguing that the articles on which it was based conveyed only the opinion of its staff and their interviewees and were therefore not action
 
 *151
 
 able.
 
 [2]
 
 The trial court agreed with defendants’ position and on June 10, 1991 granted the requested relief.
 

 The Appellate Division affirmed the trial court’s determination, stressing that the "articles complained of report accusatory opinions together with a recitation of the facts upon which they are based” and that "[especially when attributed to a source, the average reader will recognize that criticisms, allegations and accusations are not statements of fact but rather expressions of opinion” (180 AD2d 308, 316). The Court also rejected plaintiff’s contention that the articles could not be characterized as protected opinion to the extent that they suggested he was guilty of criminal wrongdoing. In the Court’s view, the allegations that plaintiff had "lied” in his professional conclusions regarding the causes of death in controversial cases and had "covered up” for misconduct by city police officers were too "[v]ague” to "amount to accusations of criminal misconduct”
 
 (id.,
 
 at 317). This Court subsequently granted plaintiff leave to appeal from the Appellate Division’s order. We now reverse and hold that the complaint should have been sustained, since, in addition to the expressed opinions and conclusions, the articles contain defamatory assertions that a reasonable reader would understand to be advanced as statements of fact.
 

 II.
 

 At the core of the dispute in this case is the much discussed distinction between expressions of opinion, which are not actionable, and assertions of fact, which may form the basis of a viable libel claim. The distinction has been the subject of considerable analysis and legal evolution in recent years
 
 (see, e.g., Milkovich v Lorain Journal Co.,
 
 497 US 1;
 
 Immuno AG. v Moor-Jankowski,
 
 77 NY2d 235,
 
 cert denied
 
 500 US 954;
 
 Steinhilber v Alphonse,
 
 68 NY2d 283). Indeed, we revisited the question ourselves just one year ago
 
 (600 W. 115th St. Corp. v Von Gutfeld,
 
 80 NY2d 130). Nonetheless, as the opinions below and the parties’ submissions illustrate, there remain many unanswered questions and areas of uncertainty in this developing field of libel law.
 

 
 *152
 
 The underlying principles are not in dispute. The Supreme Court’s decision in
 
 New York Times Co. v Sullivan
 
 (376 US 254) injected a constitutional dimension into what had previously been regarded as a matter of State common law. In that case and others
 
 (e.g., Philadelphia Newspapers v Hepps,
 
 475 US 767;
 
 Curtis Publ. Co. v Butts,
 
 388 US 130;
 
 see also, Gertz v Robert Welch, Inc.,
 
 418 US 323), the Court delineated the increased burden of proof that libel plaintiffs in the public arena must bear in order to assure the " 'unfettered interchange of ideas’ ” that is so necessary to the continued vitality of a government " 'responsive to the will of the people’ ”
 
 (New York Times Co. v Sullivan, supra,
 
 at 269, quoting
 
 Roth v United States,
 
 354 US 476, 484;
 
 and Stromberg v California,
 
 283 US 359, 369). Additionally, in
 
 Greenbelt Publ. Assn. v Bresler
 
 (398 US 6, 12, 14), the Court recognized that there are constitutional restrictions on the "permissible scope” of defamation actions and, specifically, that evident "rhetorical hyperbole” is simply not actionable
 
 (see, Milkovich v Lorain Journal Co., supra,
 
 at 16;
 
 see also, Hustler Mag. v Falwell,
 
 485 US 46, 50;
 
 Letter Carriers v Austin,
 
 418 US 264, 284-286).
 

 The focus in this appeal, which involves a preanswer dispute over the sufficiency of the complaint, is whether the articles published by defendants fall into a category that is actionable and, more specifically, whether the articles constitute the type of opinion statements that cannot, under the case law, form the basis of a defamation claim. While the Supreme Court has rejected the notion that there is a special categorical privilege for expressions of opinion as opposed to assertions of fact, it has recognized that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection”
 
 (Milkovich v Lorain Journal Co., supra,
 
 at 17-21). Further, this Court has adopted a similar view under our own State Constitution and has embraced a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more protective of "the cherished constitutional guarantee of free speech”
 
 (Immuno AG. v Moor-Jankowski, supra,
 
 at 256;
 
 see, 600 W. 115th St. Corp. v Von Gutfeld, supra,
 
 at 145).
 

 The dispositive inquiry, under either Federal or New York law, is "whether a reasonable [reader] could have concluded that [the articles were] conveying facts about the plaintiff”
 
 (600 W. 115th St. Corp. v Von Gutfeld, supra,
 
 at 139). Since
 
 *153
 
 falsity is a necessary element of a defamation cause of action and only "facts” are capable of being proven false, "it follows that only statements alleging facts can properly be the subject of a defamation action”
 
 (id.,
 
 at 139;
 
 accord, Immuno AG. v Moor-Jankowski, supra,
 
 at 254). In our State the inquiry, which must be made by the court
 
 (see, 600 W. 115th St. Corp. v Von Gutfeld, supra,
 
 at 139;
 
 Steinhilber v Alphonse, supra,
 
 at 290), entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to " 'signal * * * readers or listeners that what is being read or heard is likely to be opinion, not fact’ ”
 
 (Steinhilber v Alphonse, supra,
 
 at 292, quoting
 
 Ollman v Evans,
 
 750 F2d 970, 983,
 
 cert denied
 
 471 US 1127;
 
 accord, Immuno AG. v MoorJankowski, supra).
 

 This is not to suggest that the wisdom to be derived from the formerly utilized common-law analysis has been completely discarded. To the contrary, although the terminology may have fallen out of favor, the seasoned common-law categories for actionable and nonactionable reportage have been invoked to inform our modern constitutional analysis
 
 (Immuno AG. v Moor-Jankowski, supra,
 
 at 250;
 
 see, e.g., James v Gannett Co.,
 
 40 NY2d 415;
 
 Julian v American Bus. Consultants,
 
 2 NY2d 1;
 
 see also, Steinhilber v Alphonse, supra,
 
 at 293).
 

 Thus, in determining whether a particular communication is actionable, we continue to recognize and utilize the important distinction between a statement of opinion that implies a basis in facts which are not disclosed to the reader or listener
 
 (see, Hotchner v Castillo-Puche,
 
 551 F2d 910, 913,
 
 cert denied sub nom. Hotchner v Doubleday & Co.,
 
 434 US 834; Restatement [Second] of Torts § 566), and a statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts
 
 (see, Ollman v Evans, supra,
 
 at 976;
 
 Buckley v Littell,
 
 539 F2d 882, 893,
 
 cert denied
 
 429 US 1062; Restatement [Second] of Torts § 566, comment
 
 c).
 
 The former are actionable not because they convey "false opinions” but rather because a reasonable listener or reader would infer that "the speaker [or writer] knows certain facts, unknown to [the]
 
 *154
 
 audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]”
 
 (Steinhilber v Alphonse, supra,
 
 at 290). In contrast, the latter are not actionable because, as was noted by the dissenting opinion in
 
 Milkovich v Lorain Journal Co. (supra,
 
 at 26-27, 28, n 5 [Brennan, J.]), a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture
 
 (see, e.g., Potomac Valve & Fitting v Crawford Fitting Co.,
 
 829 F2d 1280, 1290). Indeed, this class of statements provides a clear illustration of situations in which the full context of the communication " 'signal[s] * * * readers or listeners that what is being read or heard is likely to be opinion, not fact’ ”
 
 (Steinhilber v Alphonse, supra,
 
 at 292, quoting
 
 Ollman v Evans, supra,
 
 at 983).
 

 III.
 

 Applying these principles to plaintiff’s cause is not a simple task because plaintiff’s pleadings cite the whole series of articles, each in its entirety, as the basis for plaintiff’s defamation claim. Obviously, not every word and assertion in the disputed articles is false or defamatory. Some of the actions and words attributed to plaintiff undoubtedly did take place. Furthermore, many of the objective assertions made in this series of many thousand words are uncontroversial and are therefore not the proper subject for a defamation action.
 

 We conclude, however, that the courts below erred in dismissing the complaint, since the articles it cited contain many assertions of objective fact that, if proven false, could form the predicate for a maintainable libel action. Additionally, although the articles contain many assertions that would be understood by the reasonable reader as mere hypotheses premised on stated facts, there are also actionable charges made in the articles — such as the charges that plaintiff engaged in cover-ups, directed the creation of "misleading” autopsy reports and was guilty of "possibly illegal” conduct— that, although couched in the language of hypothesis or conclusion, actually would be understood by the reasonable reader as assertions of fact
 
 (see, Rinaldi v Holt, Rinehart & Winston,
 
 42 NY2d 369, 382).
 

 Contrary to the Appellate Division’s conclusion, these assertions are not too vague to constitute concrete accusations of criminality. Nonetheless, we hold them to be actionable not,
 
 *155
 
 as plaintiff would have it, because they involve accusations of criminality per se, but rather because in this context they convey "facts” that are capable of being proven true or false. Although plaintiff repeatedly suggests otherwise, there is simply no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact.
 

 In
 
 Silsdorf v Levine
 
 (59 NY2d 8, 16,
 
 cert denied
 
 464 US 831), we merely held that an accusation of criminality that, read in context, is set forth as a fact is not transformed into a nonactionable expression of opinion merely because it is couched "in the form of [an] opinion.” To illustrate, if the statement "John is a thief’ is actionable when considered in its applicable context, the statement
 
 "I believe
 
 John is a thief’ would be equally actionable when placed in precisely the same context. By the same token, however, the assertion that "John is a thief’ could well be treated as an expression of opinion or rhetorical hyperbole where it is accompanied by other statements, such as "John stole my heart,” that, taken in context, convey to the reasonable reader that something other than an objective fact is being asserted. Indeed, it has already been held that assertions that a person is guilty of "blackmail,” "fraud,” "bribery” and "corruption” could, in certain contexts, be understood as mere, nonactionable "rhetorical hyperbole” or "vigorous epithet[s]”
 
 (see, e.g., Greenbelt Publ. Assn. v Bresler, supra,
 
 at 14;
 
 600 W. 115th St. Corp. v Von Gutfeld, supra,
 
 at 143-145).
 

 Similarly, even when uttered or published in a more serious tone, accusations of criminality could be regarded as mere hypothesis and therefore not actionable if the facts on which they are based are fully and accurately set forth and it is clear to the reasonable reader or listener that die accusation is merely a personal surmise built upon those facts. In all cases, whether the challenged remark concerns criminality or some other defamatory category, the courts are obliged to consider the communication as a whole, as well as its immediate and broader social contexts, to determine whether the reasonable listener or reader is likely to understand the remark as an assertion of provable fact
 
 (600 W. 115th St. Corp. v Von Gutfeld, supra; see, Immuno AG. v Moor-Jankowski,
 
 77 NY2d 235,
 
 supra).
 

 In this case, the assertion that plaintiff engaged in "corrupt” conduct in his capacity as Chief Medical Examiner cannot be treated as a mere rhetorical flourish or the specula
 
 *156
 
 tive accusation of an angry but ill-informed citizen made during the course of a heated debate
 
 (see, 600 W. 115th St. Corp. v Von Gutfeld, supra).
 
 Rather, the accusation was made in the course of a lengthy, copiously documented newspaper series that was written only after what purported to be a thorough investigation. Having been offered as a special feature series rather than as coverage of a current news story, the disputed articles were calculated to give the impression they were "the product of some deliberation, not of the heat of [the] moment”
 
 (id.,
 
 at 142). Moreover, since the articles appeared in the news section rather than the editorial or "op ed” sections, the common expectations that apply to those more opinionated journalistic endeavors were inapplicable here
 
 (see, Immuno AG. v Moor-Jankowski, supra).
 
 Thus, the circumstances under which these accusations were published "encourag[ed] the reasonable reader to be less skeptical and more willing to conclude that [they] stat[ed] or implied] facts”
 
 (600 W. 115th St. Corp. v Von Gutfeld, supra,
 
 at 142).
 

 In closing, we stress once again our commitment to avoiding the "hypertechnical parsing” of written and spoken words for the purpose of identifying "possible Tact[s]’ ” that might form the basis of a sustainable libel action
 
 (Immuno AG. v Moor-Jankowski, supra,
 
 at 256). The core goal of "exercises” such as this is to protect the individual’s historic right to vindicate reputation without impairing our "cherished constitutional guarantee of free speech”
 
 (id.,
 
 at 256) or casting a pall over citizens’ ability to engage in robust debate through the print and broadcast media. In this case, the reputation of a public official with significant professional credentials was allegedly impaired by a series of widely read newspaper articles that portrayed him as unethical and corrupt. Under the circumstances of his case, we conclude that this individual should be permitted to go forward in an effort to establish a right to a libel recovery. The defendants’ expressional rights as well as the cherished values embodied in the First Amendment guarantees can be adequately protected in this context by the well-established rule requiring that plaintiff prove not only that the statements he cites are false and defamatory but also that they were made with actual malice. As this Court has previously observed, compliance with the latter requirements is a matter that is well suited to testing, at least in the first instance, on a motion for summary judgment brought pursuant to CPLR 3212
 
 (see, Immuno AG. v Moor-Jankowski, supra,
 
 at 256;
 
 Karaduman v Newsday, Inc.,
 
 51 NY2d 531, 545).
 

 
 *157
 
 Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, and the motion of the Times defendants to dismiss causes of action 1 through 5 and 8 through 13 of the complaint denied.
 

 Chief Judge Kaye and Judges Simons, Hancock, Jr., and Bellacosa concur; Judges Smith and Levine taking no part.
 

 Order, insofar as appealed from, reversed, etc.
 

 [1]
 

 . For a review of the factual background of the Bumpurs case, see
 
 People v Sullivan
 
 (68 NY2d 495).
 

 [2]
 

 . The dismissal motion at issue in this appeal is the one made by The New York Times, Philip Shenon, Sam Roberts, A. M. Rosenthal and Peter Milones, all of whom are affiliated with defendant newspaper. An earlier dismissal motion by the other named defendants was granted by the trial court. The trial court also dismissed plaintiff’s sixth, seventh, fourteenth and fifteenth causes of action against the New York Times defendants. Those dismissals are not being challenged on this appeal.