**Ilya D. LEVIN, Plaintiff,**

v.

**John McPHEE, the New Yorker Magazine, Inc., and Farrar, Straus & Giroux, Inc., Defendants.**

No. 95 Civ. 5179 (LAK).

United States District Court, S.D. New York.

March 4, 1996.

Erica B. Raved, New York City, for Plaintiff.

Leon Friedman, New York City, for Defendants John McPhee and Farrar, Straus & Giroux, Inc.

Kevin W. Goering, Christine Hoey, Coudert Brothers, New York City, for Defendant New Yorker Magazine, Inc.

## OPINION

KAPLAN, District Judge.

In this action, Ilya D. Levin, plaintiff, contends that he was libeled by statements made in a book entitled THE RANSOM OF RUSSIAN ART, by defendant John McPhee. The book was published by defendant Farrar, Straus & Giroux ("Farrar") and excerpted in an article with the same title published by defendant The New Yorker Magazine, Inc. (the *"The New Yorker"*). Plaintiff complains that the portions of the book and the article pertaining to the mysterious death of a noted Russian dissident artist, Evgeny Rukhin, charge plaintiff with cowardice and with involvement in causing the deaths of Rukhin and Rukhin's friend, Ludmila Boblyak. Plaintiff contends further that the defendants intentionally inflicted emotional distress upon him by writing and publishing the book and the article. This Court has jurisdiction as a result of the diversity of the parties' citizenship.

The case is now before the Court on the defendants' motion to dismiss the complaint. Defendants urge that the book and the article, each of which presents multiple theories regarding the cause of Rukhin's death, are incapable as a matter of law of the defamatory construction plaintiff gives to them and that the statements complained of are protected expressions of opinion. McPhee and *The New Yorker* contend further that the complaint should be dismissed as against them because the statements complained of are substantially true and, to the extent that they are not, that they caused plaintiff only incremental harm. McPhee and Farrar contend that they are protected by a privilege of neutral reportage. Plaintiff has cross-moved for summary judgment on the question whether the publications are capable of a defamatory meaning or, in the alternative, for leave to amend.

*Facts*

John McPhee is a prominent author, described by his counsel as one of the most distinguished figures in American letters. He is said to be the author of twenty-three books, many of which won or were nominated for important literary prizes.[1] Farrar too has played a prominent role in American literature, publishing such world famous authors as Isaac Bashevis Singer, Alexander Solzhenitsyn, William Golding, and Derek Wolcott.

The book at issue in this case, THE RANSOM OF RUSSIAN ART, is an account of the activities of Norton Dodge, a wealthy University of Maryland professor who began traveling to the Soviet Union in the 1950's and who collected dissident art for over thirty years. Over 10,000 works collected by him now are housed and will be exhibited at the Zimmerli Art Museum at Rutgers University. His collection is said to "comprise[ ] an irreproduceable archive of the hidden struggle by hundreds of artists across the USSR who defied the proscribed [*sic* ] style and propagandistic purposes of socialist realism." Jo Ann Lewis, *Trove from the Underground: The Maryland Millionaire Who Saved the Art of a Soviet Era,* Washington Post, May 14, 1995, at G1.

The book tells the story of Dodge's trips to the Soviet Union, his often clandestine contacts with artists, and the repressive efforts of the Soviet regime. Rukhin, a prolific painter who also played an important role by accompanying Dodge on some of his collecting trips and introducing him to other dissident artists, is one of the artists featured in the book. The nub of this case concerns the book's treatment of Rukhin's death.

---

1. His works include ASSEMBLING CALIFORNIA, BASIN AND RANGE, IN SUSPECT TERRAIN, RISING FROM THE PLAINS, THE CONTROL OF NATURE, ENCOUNTERS WITH THE ARCHDRUID, THE PINE BARRENS, THE CURVE OF BINDING ENERGY, LEVELS OF THE GAME, A SENSE OF WHERE YOU ARE, THE HEADMASTER, PIECES OF THE FRAME, A ROOMFUL OF HOVINGS, THE DELTOID PUMPKIN SEED, and COMING INTO THE COUNTRY.

The relevant portion of the book appears in a nine page chapter of about 2,000 words.[2] RANSOM 149–58. The chapter opens with the statement that "Rukhin was burned to death" following his return home to Leningrad from a visit to Moscow. *Id.* 149. It recounts that Rukhin spent his final night in Moscow at the residence of the Venezuelan ambassador, whom he had met through the wife of the Argentine ambassador, a collector of Rukhin's work. Not long after Rukhin's death, the Soviet government, the book states, gave the Venezuelan ambassador twenty-four hours to leave the Soviet Union and impounded his luggage as he left. *Id.* 150. After the scene thus is set, there follow five stories or accounts of Rukhin's death, each under a heading attributing it to its source.

The first, labeled "Dodge's Version," purportedly describes how Norton Dodge "imagines the details of Rukhin's death ..." Dodge is quoted as saying that "perhaps [the K.G.B.] expected him back the next day and therefore thought they would burn out his studio in his absence as an object lesson." It states that plaintiff, Rukhin, Evgeny Esaulenko, and Esaulenko's wife (identified elsewhere as Ludmila Boblyak) were at Rukhin's studio having a party. It notes that Esaulenko's wife also died and accuses the fire department of holding back. It adds that "The K.G.B. probably didn't know he [Rukhin] was there." And it attributes to Dodge the view that "the death of Rukhin quickly became a story variously told, with about as many versions as there were tellers ..." "[S]ince it was ... a story seemingly known to silent narrators its mystery had been preserved." *Id.* 151.

The next account is labeled "Melamid's Version" and purports to quote the Moscow artist, Alexander Melamid, as presenting the story of Rukhin's death in pertinent part as follows: "There are two main versions. (1) K.G.B. (2) He lived dangerously. Dangerously? Going to the foreigners drinking.

He kept a bohemian image. It sets you free from social bonds. He was the freest man of all of us. It seemed that he had no fear. We all knew that he would pay for this sooner or later. What watched him, God or the K.G.B.? Either God or the K.G.B. punished him. Was it intended that he die? It doesn't matter. Crime and punishment." *Id.* 151–52 (internal quotations omitted).

The third recounting is entitled "Burke's Version" and is attributed to an American, Sarah Burke, who is said to have been romantically involved with Rukhin and to have been expecting a call from Rukhin around the time of his death. The book states, "Burke outlines what she sees as three possible causes: '(1) The K.G.B. (2) An accident. (3) His wife.'" *Id.* 152. She is quoted as elaborating on each possibility, in part as follows: "The K.G.B. were following his movements pretty carefully. Some people think that Ilya Levin did it for them, that he was 'politically inspired.' It's a possibility." *Id.* She adds that "Most people think that the fire was set, but I think it could have been an accident—the studio full of vodka, cigarettes, and the chemically soaked rags." She is quoted as saying also that some think that Rukhin's wife, Galina, killed him because Rukhin intended to emigrate to the United States. *Id.*

Next is "Kuzminsky's Version," which is perhaps the most colorful of the tales. He is quoted at the outset as rejecting the theory that the fire was an accident. Rather, Kuzminsky is quoted as saying that plaintiff, Rukhin, and Ludmila Boblyak, "were making love sandwich-style in room 3 [of Rukhin's studio]" when the fire started and quickly blocked the exit. Kuzminsky is said to have added that he could imagine "the response of agents from the K.G.B. upon discovering two men closely compressed to either side of Ludmila." "'When they came to the last room,'" Kuzminsky says, "'seeing the lady intercoursing with two fellows, I know what those K.G.B. prudists would think. They

2. The entire chapter is annexed to the first amended complaint as Exhibit A. In view of the extensive reference to the book in the complaint, the Court considers the entire work as properly before it on this Rule 12(b)(6) motion. *E.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 1996 WL 33050 at *5 (2d Cir.1996); *International Audiotext Network, Inc. v. American Telephone & Telegraph Co.,* 62 F.3d 69, 71–72 (2d Cir.1995).

said something nasty. Ludmila attacked them. They hit her. Even if a lady strikes them they answer with a good professional blow. Rukhin defended her. They hit him. Then they set the fire. Galia [*sic*] says that when they put Rukhin in the ambulance he was alive. They finished him there. Levin and Esaulenko are selfish cowards. They never will protect nobody.'" *Id.* 153–54.

The final story, "Galina's Version," is that attributed to Rukhin's wife. Galina was awakened late at night by the police, who told her there had been a fire. Rukhin already was dead. She went to the studio, where a crowd was gathered in the courtyard below. Neighbors reportedly told her that two men appeared in the studio windows during the fire and came down a ladder. When someone asked for Galina's address, one of the men who had come down the ladder, whom Galina reportedly knew or believed was Esaulenko, said "'Don't bother for twenty more minutes. Wait.'" *Id.* 155. Galina said that she went to the K.G.B. immediately after identifying Rukhin and Boblyak at the morgue. Although the K.G.B. agents "described to her a lewd, orgiastic scene," Galina allegedly responded that she knew that Rukhin had been killed. *Id.* 156.

Some time later, the book continues, Galina encountered Esaulenko at Boblyak's funeral and accused him of being a murderer. Galina says also that a doctor informed her that there were injection marks on Rukhin's thigh and that a medical student told her that Rukhin was killed by injection before the fire. The book then quotes Galina as saying, "Ludmila probably rebelled and was choked when she refused to cooperate with the murderers," adding that the studio was burned "to cover the murder." *Id.* 157.

*The New Yorker* article, insofar as it is relevant here, is a verbatim reproduction of the chapter of RANSOM summarized above, save that it omits the versions attributed to Melamid, Burke and Kuzminsky as well as two final paragraphs of Galina's version, which are not significant to the issues presented by these motions. (First am cpt Ex B)

### The Complaint and the Motions

The first amended complaint contains three counts. The first, against McPhee and Farrar, charges that the book libeled plaintiff by accusing him of cowardice, involvement in the murders of Rukhin and Boblyak, and of working for the K.G.B. The second, against McPhee and *The New Yorker*, makes the same contention with respect to the article. Both charge that the defendants knew that the statements made were untrue or recklessly disregarded their truth. (First am cpt ¶¶ 25, 42) The third cause of action contends that all defendants are liable for the intentional infliction of emotional distress.

### Discussion

#### Choice of Law

In this diversity action, the Court applies New York's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). At one time, New York applied the law of the state in which the last act necessary to complete the tort occurred. This approach was not well suited to libel cases involving multi-state publications where it was unclear whether the last act was the act of publication or the act of communication and, worse, where the act of communication took place when the publication involved was a nationwide medium. *See Brayton v. Crowell–Collier Pub. Co.,* 205 F.2d 644, 646 n. 3 (2d Cir.1953); Ludwig, *'Peace of Mind' in 48 Pieces v. Uniform Rights of Privacy,* 32 MINN.L.REV. 734, 760–62 (1948). The question has been simplified significantly by New York's adoption of the test articulated in the RESTATEMENT (SECOND) CONFLICTS OF LAW § 6 (1988), which applies to each issue the law of the state that has the most significant relationship to that issue. *Babcock v. Jackson,* 12 N.Y.2d 473, 481–82, 240 N.Y.S.2d 743, 749–50, 191 N.E.2d 279 (1963) (tort cases); *see also Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954) (contract cases). The standard of tort liability therefore generally is determined according to the law of the state with the greatest interest in regulating the injurious conduct at issue. *Babcock,* 12 N.Y.2d at 484, 240 N.Y.S.2d at 752.

In this case, the conduct at issue—publication of the allegedly libelous statements—took place in New York, where the author resides and where both publishers are headquartered. New York law therefore governs the question of liability. *Davis v. Costa–Gavras*, 580 F.Supp. 1082, 1091–93 (S.D.N.Y.1984); *see also Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238, 1242 n. 7 (5th Cir.1980); *cf. King v. Hildebrandt*, 331 F.2d 476, 478 (2d Cir.1964) (applying New York's grouping of contacts approach and concluding that District of Columbia law applied where all of the parties were domiciled in the District and allegedly libelous statements were made in court proceedings in the District).[3]

*Defamatory Meaning*

To state a claim for libel under New York law, the plaintiff must show that the defendants wrongfully[4] published to third persons a false and defamatory statement of and concerning, and which injured, the plaintiff. *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61–62 (2d Cir.1993). A statement is defamatory "if it tends to expose a person to hatred, contempt, or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community," or "tends to disparage a person in the way of his office, profession or trade." *Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 135–36, 182 N.Y.S.2d 1, 3, 155 N.E.2d 853, 855 (1959). Defendants begin their attack on the complaint with the contention that the statements cannot, as a matter of law, bear the defamatory construction which plaintiff gives to them.

It is important at the outset to understand the Court's limited function on the issue of defamatory meaning. Under New York law, the court determines as a matter of law whether the statements complained of are reasonably susceptible of a defamatory construction. *James v. Gannett Co.*, 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874–75, 353 N.E.2d 834, 837–38 (1976). If they are " 'it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.' " *Id.* 386 N.Y.S.2d at 874, 353 N.E.2d at 837 (quoting *Mencher v. Chesley*, 297 N.Y. 94, 100, 75 N.E.2d 257 (1947)); *accord, Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir.1994); *Carney v. Memorial Hosp. and Nursing Home of Greene County*, 64 N.Y.2d 770, 772, 485 N.Y.S.2d 984, 986, 475 N.E.2d 451, 453 (1985). In deciding whether a publication is capable of a defamatory meaning, the court must read the allegedly defamatory statements in the context of the publication as a whole with reference to the circumstances and background of its issuance and must not strain to give the publication either an innocent or a defamatory construction. *James v. Gannett Co.*, 40 N.Y.2d at 419–20, 386 N.Y.S.2d at 874, 353 N.E.2d at 837.

*The Book*

The book contains one statement, attributed to Burke who in turn is reporting the views of others, directly asserting that plaintiff may have murdered Rukhin: "The K.G.B. were following his [Rukhin's] movements pretty carefully. Some people think that Ilya Levin did it for them, that he was 'politically inspired.' It's a possibility." More broadly, the book indicates that Rukhin and Boblyak died in circumstances that have led some to conclude that they were murdered, and implies that plaintiff may have assisted, although it makes clear also that

---

**3.** The parties have assumed for the most part that New York law applies and have expressed the opinion that New York and District of Columbia law may not differ in ways relevant to this case. Mem. of Farrar and McPhee at 14 n. 11; Mem. of *The New Yorker* at 8 n. 6; Pl.Mem. at 3 n. 1.

**4.** The standard of culpability varies depending upon circumstances that are not relevant here. As is well known, for example, a public figure plaintiff must establish that the defendant published with knowledge of falsity or that it in fact entertained serious doubt as to truth. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

many others believe that the truth likely never will be known.[5]

The statement attributed to Burke, if false and standing alone, is susceptible to a defamatory meaning. Certainly a false statement that "Levin did it for them" would be a classic example of a defamatory statement. *See, e.g., Ideal Publishing Corp. v. Creative Features, Inc.*, 59 A.D.2d 862, 399 N.Y.S.2d 118 (1st Dept.1977) (accusation of involvement in a serious crime is defamatory). The fact that the author puts the statement in Burke's mouth, and that Burke in turn attributes it to others, does not alter this conclusion as a matter of the common law of defamation.[6] It has long been the rule that one who republishes a libel is guilty of libel. *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 61 (2d Cir.1980); RESTATEMENT (SECOND) TORTS § 578 (1977). Hence, the defamatory meaning of the statement is not changed by its attribution to others.

The battle over defamatory meaning, however, is fiercest when the book is taken as a whole, as it must be, and the focus is placed on the effect the entire work, as distinguished from this (or any other) isolated statement, would have on the mind of the average reader. *James v. Gannett Co.*, 40 N.Y.S.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976). In this case, defendants contend that the presentation of several inconsistent versions, which they liken to the classic Japanese folk tale, *Rashomon*, would preclude any reasonable person from giving the work as a whole a defamatory interpretation.

Plaintiff asserts that the multiple versions, despite presenting the possibility that Rukhin's and Boblyak's deaths were accidental or the work of the K.G.B. unaided by plaintiff, nevertheless would lead a reasonable person to conclude that plaintiff helped the K.G.B. kill them. That possibility, among others, is openly suggested by Burke. Kuzminsky and Galina blame K.G.B. agents for Rukhin's death, while Dodge blames them for setting the fire, perhaps without knowing that Rukhin was present. Dodge and Kuzminsky place plaintiff at the scene. Galina professes her belief that there were "murderers" (plural) involved and relates that witnesses saw Esaulenko, whom Galina calls a murderer, and another man leave the scene after telling bystanders to wait before notifying her. Burke states that two men, whom she identifies as plaintiff and Esaulenko, ran from the scene without calling the fire department. Dodge says that the fire department "held back." Putting these pieces together, plaintiff asserts, a reasonable person easily could conclude that Rukhin and Boblyak were killed and that plaintiff, acting in concert with the K.G.B., was one of their murderers.

Defendants respond that one could reach that conclusion only by rejecting many other pieces of the chapter and that no reasonable person would do so. They argue that the overall impression created is that the cause of Rukhin's and Boblyak's deaths remains shrouded in mystery, that it may have been an accident or homicide, and that plaintiff may or may not have been involved. In

---

5. Plaintiff complains also that the book falsely imputes cowardice to him by alleging that he ran from the scene of the fire that destroyed Rukhin's studio and failed to stand up to the K.G.B. in order to protect his friends. Running from a fire is prudent rather than cowardly, and that assertion therefore is not defamatory. *See Ladany v. William Morrow & Co., Inc.*, 465 F.Supp. 870 (S.D.N.Y.1978) (holding to be non-defamatory a false assertion that Israeli Olympic athlete abandoned his teammates in order to escape Palestinian terrorists at 1972 Munich Olympics). Plaintiff objects also to this statement, attributed to Kuzminsky: "Ludmila attacked them [the K.G.B.]. They hit her.... Rukhin defended her. They hit him. Then they set the fire.... Levin and Esaulenko are selfish cowards. They never will protect nobody." At worst, this statement implies that plaintiff did not seek to defend

Boblyak from K.G.B. agents and characterizes his inaction as cowardly. This statement contains elements of fact and opinion. The factual imputation—that plaintiff failed to defend Boblyak—is not defamatory because refusing to attack K.G.B. agents, like fleeing a fire, is prudent. The opinion component, even if otherwise defamatory, is constitutionally protected as is explained below. *See also Greenbelt Cooperative Pub. Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970).

6. As will appear, however, the layers of attribution and the use of the phrase "some people think" are important in determining whether the statement, although actionable at common law, is a constitutionally protected expression of opinion.

these circumstances, they say, no reader reasonably could conclude that plaintiff was a murderer.

■ Defendants' argument goes too far, principally because it ignores the very definition of defamation and the limited role of the Court in determining whether a publication is susceptible of a defamatory meaning. The book clearly conveys the point that at least some people think the plaintiff is a murderer, although it equally clearly communicates considerable disagreement and uncertainty on the point. The Court's role, however, is merely to say whether a publication offering, among several alternative explanations for a suspicious death, the possibility that the plaintiff *committed murder and worked with* or on behalf of a secret police organization could reasonably be construed as *"tend[ing]* to expose [plaintiff] to hatred, contempt, or aversion, or to induce an evil or unsavory opinion of him. . . ."* *Tracy*, 5 N.Y.2d at 135, 182 N.Y.S.2d at 3, 155 N.E.2d at 855 (emphasis added). Uncertainties and differences of view reflected in the book notwithstanding, this Court concludes that a significant segment of the relevant audience reasonably could come away from the book with the sort of reaction to plaintiff that would bring the work, if false, within the definition of defamation. While it is at least plausible, as defendants contend, that the plurality of possible causes of Rukhin's death, particularly presented as they are in a context of acknowledged uncertainty, could prevent such a reaction, that question is for the jury rather than the Court. *See Davis v. Ross*, 754 F.2d 80, 82–83 (2d Cir.1985); *Mencher v. Chesley*, 297 N.Y. 94, 102, 75 N.E.2d 257, 260 (1947).

*The Article*

■ The article omits the versions of Rukhin's death attributed to Kuzminsky and Burke, presenting only Dodge's and Galina's versions. As he did with the book, plaintiff again attempts to construct a defamatory pastiche from the various versions of Rukhin's death. Without Burke's and Kuzminsky's versions, plaintiff's reading of the article is strained, but it remains plausible. Dodge's and Galina's versions, plus other statements complained of, indicate foul play. Dodge puts plaintiff at the scene with only three others, Esaulenko, Rukhin, and Boblyak. He states that Rukhin and Boblyak died. Galina contends that two men fled the burning studio, one of whom, identified as Esaulenko, told the crowd that had gathered to wait before notifying her. Dodge suggests that "they" killed Rukhin because of his growing international stature, but that "they," i.e., the K.G.B., probably killed Rukhin accidentally. Galina disputes the K.G.B.'s official version of Rukhin's death and says that she knows he was killed. She accuses Esaulenko of being a murderer, and indicates that "murderers" were involved. The implication, again, arguably is that plaintiff may have been one of those murderers. Since a reasonable person could construe the article in this fashion, the question of whether it in fact was so construed is one for the jury.[7]

*Neutral Reportage*

■ Defendants McPhee and Farrar seek dismissal on the ground that the book is

---

7. This conclusion makes it unnecessary to determine whether affidavits submitted by plaintiff of persons who concluded upon reading either the article or the book that it accused plaintiff of complicity in Rukhin's death are appropriately considered in determining the publications' susceptibility to a defamatory construction. The Court notes, however, that there are significant practical difficulties in considering such evidence. Moreover, given that the issue with respect to defamatory meaning is the likely construction by the proverbial reasonable person, the issue arguably is properly left to the trier of fact, unaided by witnesses who in substance are merely oath helpers. *See, e.g., Bishop v. New York Times Co.*, 233 N.Y. 446, 454–55, 135 N.E. 845, 848 (1922) (excluding opinions of third persons as to the gravity of a libel); *Burdick v. Shearson American Express, Inc.*, 160 A.D.2d 642, 642–43, 559 N.Y.S.2d 506; 508 (1st Dept.) (same), *leave to appeal denied*, 76 N.Y.2d 706, 560 N.Y.S.2d 988, 561 N.E.2d 888 (1990); *Gibson v. Williams*, 4 Wend. 320, 324–26 (N.Y.Sup. Ct.1828) (excluding opinion evidence as to whether publication was of and concerning the plaintiff); *Van Vechten v. Hopkins*, 5 Johns. 211, 226 (N.Y.Sup.Ct.1809) (same); *Michaels v. Gannett Co.*, 10 A.D.2d 417, 420, 199 N.Y.S.2d 778, 781 (4th Dept.1960) (same); *Stokes v. Morning Journal Ass'n*, 66 App.Div. 569, 73 N.Y.S. 245 (1st Dept.1901) (same); *People v. Parr*, 42 Hun 313, 316 (N.Y.App.Div.3d Dept.1886) (same); *see also* VII WIGMORE ON EVIDENCE § 1924 (James Chadbourn ed. 1978).

protected by the neutral reportage privilege articulated by the Second Circuit in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).[8] Under *Edwards*, the common law rule that one who republishes a libel is guilty of libel has been modified to protect a newspaper, and presumably other media outlets, when it republishes a defamatory statement in the context of (i) "an accurate and disinterested report" (ii) regarding a newsworthy controversy (iii) in which the defamatory statement was made by a "responsible, prominent organization," (iv) provided that the statement is not endorsed by the republisher. *Id.*, at 120.

More recently, *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 67 (2d Cir.1980), construed *Edwards* to apply to cases involving plaintiffs who are public officials or figures. Applying *Edwards* to this case therefore would require determining whether plaintiff is a public figure or a private figure involved in a matter of public concern. If the plaintiff were determined to be a private figure, application of the privilege in this case would require extension of *Edwards*. *Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System, Inc.*, 844 F.2d 955, 961 (2d Cir.) (declining to decide whether extension of the privilege to private figure plaintiff cases is warranted), *cert. denied*, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988). Plaintiff's status as a public or private figure has not been argued or briefed, making this an inappropriate stage at which to decide whether to extend *Edwards*, even if it otherwise were applicable in this case. The point need not be decided, however, as defendants have not shown that their actions otherwise fall within the protection provided by the privilege.

Leaving aside plaintiff's contention that the report is inaccurate, it is clear that Galina, Burke, Dodge, Kuzminsky and Melamid are not all "responsible, prominent organization[s]" or otherwise comparable to the National Audubon Society, whose allegations in themselves would be newsworthy. Moreover, as several courts have ruled, *Edwards* protects only reporting of newsworthy controversies, as distinguished from situations in which the reporter elicits the defamatory statement, particularly where the events are temporally remote. *Lasky v. American Broadcasting Companies, Inc.*, 631 F.Supp. 962, 971 (S.D.N.Y.1986); *McManus v. Doubleday & Co., Inc.*, 513 F.Supp. 1383, 1391 (S.D.N.Y.1981). As Judge Weinfeld put it:

> "Since there is no indication in the *Edwards* opinion that the neutral reportage privilege was meant to cover investigative reporting, and since including reports of such journalist-induced charges within the protection of the privilege is unnecessary for promoting the purpose of *Edwards*, the freer reporting of raging controversies, this court is constrained to find the defendant-author here unprotected by the privilege." *McManus*, 513 F.Supp. at 1391.

In this case, the various versions were elicited by McPhee and related to events that took place in 1976, eighteen years prior to the publication of McPhee's book and article. In these circumstances, Rukhin's death cannot be deemed a "raging controvers[y]," at least on the basis of the limited record now before the Court. The Court therefore declines to resolve the matter on the basis of *Edwards* at this stage of the proceedings.

*Opinion*

All defendants move to dismiss the complaint on the ground that the statements alleged to be libelous are opinion, rather than provably false assertions of fact.

The idea that the United States Constitution absolutely protects opinion from forming the basis for liability in defamation arose in part from a now famous Supreme Court dictum: "There is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789

---

8. The *Edwards* privilege is not recognized under New York law. Where precedent in this Circuit construes the U.S. Constitution, however, this Court follows that construction in diversity cases notwithstanding contrary state law. *Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System, Inc.*, 844 F.2d 955, 961 n. 12 (2d Cir.) (applying *Edwards*), *cert. denied*, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988).

**240**

(1974). It has been pressed vigorously by defamation defendants, but the Supreme Court eventually concluded that the *Gertz* dictum is not to be read literally. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Court held that there is no absolute constitutional privilege for the expression of opinion. Instead, the Court held that only statements that can be proven false are capable of supporting a libel claim and that expressions of opinion which make implied assertions of provably false facts are included in the class of actionable statements. *Id.* at 19–20, 110 S.Ct. at 2705–06.

 Whatever the ultimate import of *Milkovich,* New York's Court of Appeals has held that opinion receives greater protection under the New York than under the United States Constitution. *Immuno A.G. v. Moor-Jankowski (II),* 77 N.Y.2d 235, 247–48, 566 N.Y.S.2d 906, 912–13, 567 N.E.2d 1270, 1276–77, *cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). It subsequently held that the question whether an allegedly defamatory statement is one of opinion, and therefore not actionable under state law, or one of fact depends upon whether (i) the language has a readily understood meaning, (ii) the statement is incapable of being proven false, and (iii) the specific text or the social context signals to the reader that the statement is opinion rather than fact.[9] *Gross v. New York Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 817, 623 N.E.2d 1163, 1167, (1993). Accordingly, the Court proceeds to consider these publications under this standard.

 The statement attributed to Burke—"The K.G.B. were following his [Rukhin's] movements pretty carefully. Some people think that Ilya Levin did it for them, that he was 'politically inspired.' It's a possibility."—clearly is one of opinion under *Gross.* Although the statement conceivably could be proven false, the implied assertion that plaintiff in fact did kill Rukhin is indefinite, qualified as it is by the comment that "[i]t's a possibility." A hypothetical statement such as "I believe, on the basis of what people say, that it is a possibility that X killed Y," particularly when, as here, it is followed by an alternative explanation such as, "I think also that Y's death could have been an accident," signals to the reader that what is being expressed is no more than speculation. This is particularly true in this case in light of the presentation of conflicting theories provided both by Burke—who said that she thought it more likely that the fire was an accident—and by other speakers. Moreover, Burke's preface that "some people think that [plaintiff] did it" provides an additional signal that her statement is opinion rather than fact.[10] Nor is there any implication in Burke's statement that she is in possession of facts, unknown to the reader, to support the view that plaintiff might have murdered Rukhin and Boblyak. The facts which form the basis for Burke's statement that plaintiff may have committed a criminal act are set out, and she then reports the opinion of others that plaintiff may be a criminal. The reader is able to draw his or her own conclusion from the facts and agree or disagree with Burke's statement.[11] *Gross,* 82 N.Y.2d at 155, 603 N.Y.S.2d at 819, 623

9. The question whether a statement is one of opinion or fact is one of law for the court under both federal and New York law. *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 224 (2d Cir.1985); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943, 950, 366 N.E.2d 1299, 1306, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

10. It bears emphasizing that the Court is assuming at this point that the statement is defamatory, having held that attribution to others does not preclude liability for republication of a defamatory statement and that where, as here, the statement is susceptible of a defamatory construction

the issue of whether it was in fact understood to be defamatory is for the jury. The question here, which is one of law, is whether the context and language of the statement was such that the statement is constitutionally protected opinion or unprotected fact.

11. Such a statement can be regarded as an actionable assertion of fact only where the author or speaker implies the existence of unstated facts upon which the opinion is based. *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *Gross,* 82 N.Y.2d at 153–54, 603 N.Y.S.2d at 818, 623 N.E.2d at 1168.

N.E.2d at 1169.[12] Under *Immuno A.G. (II)* and *Gross,* Burke's statement therefore is a non-actionable expression of opinion.

█ The Court has held also that, when considered in full, both the book and the article could convey to a reasonable reader the idea that plaintiff was involved with the K.G.B. in killing Rukhin and Boblyak. The question remains whether a reader who drew that conclusion would understand that to be an assertion of fact or an expression of opinion. What is at issue is whether McPhee's overall composition, and his presentation of the views of those he interviewed and the events about which he wrote, amounts to a defamatory assertion of fact. The author need not have asserted the fact directly; he still may be liable if he asserts it by implication. *See Lutz v. Watson,* 136 A.D.2d 888, 525 N.Y.S.2d 80 (4th Dept.1988). Thus the question is whether a reader could understand McPhee to have said, albeit indirectly, either "Levin helped kill Rukhin and Boblyak," or "I believe, given the information that I have presented, that Levin may have helped kill Rukhin and Boblyak." Again, in this context, the question is not whether that allegation may be defamatory, nor whether the author is protected by placing it in the mouths of others. Instead, the Court must determine whether, as a matter of law, the language and context of the publication shows that it is a constitutionally protected expression of opinion rather than an assertion of fact.

If the author imputes criminality to the plaintiff as a hypothesis drawn from stated facts, rather than as an assertion of fact in itself, he has not vouched for the truthfulness of the defamatory statement, and a reasonable reader could not conclude that it was an assertion of fact. *Gross,* 82 N.Y.2d at 155,

603 N.Y.S.2d at 819, 623 N.E.2d at 1169.[13] That is the case here. At most, plaintiff has shown that the book and the article suggest that he may have been involved with the K.G.B. in murdering Rukhin and Boblyak. McPhee does not suggest that he possesses facts unknown to the reader that prove plaintiff was involved. To the contrary, he declares that the truth never will be known. He presents inconsistent versions of the events surrounding the fire and at most implies that he considers it possible that plaintiff was involved. Thus, McPhee's statement that plaintiff may have been involved in Rukhin's and Boblyak's deaths is indefinite and surrounded by textual signals suggesting that it is opinion rather than fact.

The social context in which the book and the article were published is not such as to convey unequivocally the idea that they contain only expressions of opinion. Respected publishers published a respected non-fiction author's historical account of the Russian dissident art collecting activities of Norton Dodge. This social context was such that readers would take McPhee's presentation of historical events as assertions of fact, unlike statements made in the context of letters to the editor, hyperbole, or critical reviews.[14] But readers would be attentive also to McPhee's signals distinguishing fact from speculation and might well have looked to McPhee's work for both his account of the facts and his opinions derived from those facts.

McPhee's signals were clear enough to alert readers that his discussion of the fire at Rukhin's studio contained speculation derived from the facts presented. The Court holds that, at worst, a reasonable reader could conclude only that McPhee was of the opinion, based on the facts presented, that

---

**12.** All the same considerations apply to the statement that plaintiff might have been working for the K.G.B.

**13.** It is sometimes said that the author must espouse or approve the defamatory assertion for it to be actionable against him. *E.g., White v. Fraternal Order of Police,* 909 F.2d 512, 520 (D.C.Cir.1990). That may be too broad a rule, but the absence of such an endorsement by the author, and the presentation of alternatives, certainly should be considered when determining

whether the overall effect of the author's work amounts to a statement of fact or opinion.

**14.** *E.g., Immuno A.G. v. Moor–Jankowski,* 74 N.Y.2d 548, 549 N.Y.S.2d 938, 549 N.E.2d 129 (1989) (letter to the editor); *Moldea v. New York Times Co.,* 22 F.3d 310 (D.C.Cir.) (book review), *cert. denied,* —— U.S. ——, 115 S.Ct. 202, 130 L.Ed.2d 133 (1994); and *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 226 (2d Cir.1985) (hyperbolic restaurant review).

plaintiff might have been involved with the K.G.B. in causing Rukhin's and Boblyak's deaths. The expression of that opinion is not actionable. The defendants' motion to dismiss therefore is granted with regard to the first and second counts of the complaint on the ground that to the extent that the book and the article make defamatory statements about the plaintiff those statements are expressions of opinion which may not, under the New York Constitution, form the basis of a libel claim.

*Intentional Infliction of Emotional Distress*

All defendants move to dismiss plaintiff's claim for intentional infliction of emotional distress. Defendants contend that the claim seeks recovery for the same injuries caused by the alleged libel. They contend also that the alleged conduct fails to reach the level legally sufficient to support a claim of intentional infliction of emotional distress. The claim is dismissed on several independent grounds.

■ First, New York's courts have rejected claims of intentional infliction of emotional distress "where the conduct complained of falls well within the ambit of other traditional tort liability." *Fischer v. Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978). Recovery on a theory of intentional infliction of emotional distress for the emotional distress caused by publication of a libel has been held to be duplicative and more properly addressed within the context of a libel suit. *Sweeney v. Prisoners' Legal Serv. of New York, Inc.*, 146 A.D.2d 1, 7, 538 N.Y.S.2d 370, 374 (3d Dept.), *appeal dismissed*, 74 N.Y.2d 842, 546 N.Y.S.2d 558, 545 N.E.2d 872 (1989); *Manno v. Hembrooke*, 120 A.D.2d 818, 820, 501 N.Y.S.2d 933, 936 (3d Dept.1986).

Second, the emotional distress claim rests on the same publications as the libel claims, publications that the Court has held are protected under the New York Constitution. Recasting the libel claims as a claim for intentional infliction of emotional distress cannot impose liability on defendants for the same conduct already held to be protected under the state constitution. Were liability imposed in such a situation, the constitutional protection would be illusory.[15]

■ Third, defendants rightly point out that the conduct alleged by plaintiff fails to meet the very strict standard applied in New York to determine whether conduct is sufficiently injurious to support such a claim. *See Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir.1985). Under New York law, "[t]he tort of intentional infliction of emotional distress predicates liability on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (1985) (holding that violation of confidentiality provisions of New York's Domestic Relations Law by publication of information contained in court papers in a divorce action was not capable of sustaining an intentional infliction of emotional distress claim). Moreover, the Second Circuit has interpreted New York law as requiring that the conduct which allegedly caused the emotional distress be intentionally directed at the plaintiff without any reasonable justification; a showing of gross recklessness is insufficient. *Martin*, 762 F.2d at 220; *Garland v. Herrin*, 724 F.2d 16, 18 (2d Cir. 1983). Finally, the conduct usually must involve a continuous course of harassment, rather than a single instance of abuse. *See Lopez v. City of New York*, 901 F.Supp. 684

---

**15.** *See Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) (holding that intentional infliction of emotional distress claim based on satirical cartoon requires same proof of actual malice as libel when public figure plaintiff is involved); *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1220 n. 4 (9th Cir.1990) (holding that interference with contract claim cannot be based on constitutionally protected speech or petitioning of government), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992); *Hutchinson v. Proxmire*, 579 F.2d 1027, 1036 (7th Cir.1978) (intentional inflic-

tion of emotional distress, invasion of privacy, and interference with contract claims cannot be based on constitutionally protected speech), *reversed on other grounds*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Rudoff v. Huntington Symphony Orchestra, Inc.*, 91 Misc.2d 264, 266, 397 N.Y.S.2d 863, 865 (Sup.Ct.1977) (allowing claim for interference with contract based on citizen's lobbying against government subsidy for orchestra would infringe right to petition government); Restatement (Second) Torts § 566 cmt. f (1977).

(S.D.N.Y.1995); *Roberts v. Pollack,* 92 A.D.2d 440, 448, 461 N.Y.S.2d 272, 277 (1st Dept.1983).

 At worst, plaintiff alleges that defendants published false statements about him, without regard for the injury that he might suffer therefrom, in order to sell books and magazines. There is no evidence that the defendants directly targeted plaintiff. Indeed, they only quoted others' comments about plaintiff's involvement in a historical event. Moreover, even assuming that plaintiff's libel claim had been sustained against defendants' motions to dismiss, the fact that conduct may be unlawful or tortious has not in itself been held to render such conduct so outrageous and intolerable as to support an action for intentional infliction of emotional distress. *See Freihofer,* 65 N.Y.2d 135, 490 N.Y.S.2d 735, 480 N.E.2d 349. Courts have held that conduct at least as harmful as that alleged in this case cannot sustain a claim for intentional infliction of emotional distress.[16]

Because plaintiff's intentional infliction of emotional distress claim is duplicative of his libel claim, derives from the same conduct already held to be protected under the state constitution, and does not meet the standard of outrageousness established by New York law, defendants' motions to dismiss the claim for intentional infliction of emotional distress are granted.

### Conclusion

For the foregoing reasons, defendants' motions are granted and the complaint dismissed.

SO ORDERED.

---

**16.** *E.g., Martin,* 762 F.2d at 220 (subjecting an employee to a polygraph test on the basis of race); *Butler v. Delaware Otsego Corp.,* 203 A.D.2d 783, 785, 610 N.Y.S.2d 664, 666 (3d Dept.1994) (circulating allegedly defamatory materials about an individual to the press and to business associates); *Owen v. Leventritt,* 174 A.D.2d 471, 472, 571 N.Y.S.2d 25 (1st Dept.) (threatening to kill plaintiff), *leave to appeal denied,* 79 N.Y.2d 751, 579 N.Y.S.2d 651, 587 N.E.2d 289 (1991); *Doe v. American Broadcasting Companies,* 152 A.D.2d 482, 483, 543 N.Y.S.2d 455 (1st Dept.) (breaking promise to disguise rape victims' identities in broadcast with result that victims voices and faces were recognizable), *appeal dismissed,* 74 N.Y.2d 945, 550 N.Y.S.2d 278, 549 N.E.2d 480 (1989); *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (1983) (firing an employee and throwing his belongings out of his office into the street because of whistle blowing activity) (for the full statement of facts see the trial court's opinion, 112 Misc.2d 507, 447 N.Y.S.2d 218).