Ansa QURESHI, Plaintiff

v.

**ST. BARNABAS HOSPITAL CENTER
and David Rubin, MD Defendants.**

**No. 04 Civ. 7594 VM AJP.**

United States District Court,
S.D. New York.

May 8, 2006.

Jeffrey M. Bernbach, Bernbach Law Firm, White Plains, NY, for Plaintiff.

Terri L. Ross, McDermott, Will & Emery, LLP, New York City, Jason Laurence Bernbach, Bernbach Law Firm, White Plains, NY, for Counter Defendants.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

■ Plaintiff Ansa Qureshi ("Qureshi") brought this action against St. Barnabas Hospital Center ("St. Barnabas" or "the Hospital") and David Rubin, M.D. ("Rubin") (together "Defendants"). Qureshi, a former resident in St. Barnabas's pediatrics residency program (the "Program"), initially brought claims for discrimination on account of her race, religion and national origin in violation of state law, and for defamation. St. Barnabas counterclaimed that Qureshi committed fraud in her dealings with the Hospital. The parties subsequently stipulated to the dismissal, with prejudice, of the discrimination claims. Before the Court is Defendants' motion for summary judgment on the defamation claim. Qureshi, a domiciliary of Illinois, invokes the Court's diversity jurisdiction in this suit alleging exclusively state law claims against Defendants, citizens of New York, and has alleged in good faith that the amount in controversy exceeds $75,000.[1]

By Order dated March 29, 2006, the Court granted Defendants' motion for

---

1. The complaint alleges that as a result of Defendants' actions, Qureshi has been unable to complete her medical training and therefore has been unable to obtain employment as a medical doctor. Qureshi alleges that she has been damaged in an amount no less than $10 million. The Court recognizes the difficulty and inherent uncertainty in calculating the value of a professional career, which may span decades. However, "[w]here the damages sought are uncertain, the doubt should be resolved in favor of the plaintiff's pleadings." *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir.1994) (*citing McDonald v. Patton*, 240 F.2d 424, 426 (4th Cir.1957)). Unless it appears to a legal certainty from the face of the complaint and the facts as they were at the time of its filing that a plaintiff cannot recover the minimum jurisdictional amount, dismissal on this basis

summary judgment. The Court there indicated that its findings, reasoning and conclusions would be set forth in a subsequent Decision and Order. Accordingly, this Opinion further explains the basis for the Court's March 29, 2006 ruling.

## I. *BACKGROUND*[2]

### A. *QURESHI'S PARTICIPATION IN THE PROGRAM*

In July 2002, Qureshi entered the Program as a second-year resident. She had completed her first year of a pediatrics residency at the Medical College of Ohio. Rubin, Dr. David Fox ("Fox"), Dr. David Fagan ("Fagan"), and others supervised her work as a resident in the Program.

The Program received provisional accreditation from the Accreditation Council for Graduate Medical Education ("ACGME") in the fall of 2001. Per ACGME and American Board of Pediatrics ("ABP") guidelines, the Program must evaluate residents in a number of areas known as "core competencies," including medical knowledge and professionalism. Evaluations occur by way of written rotation evaluations completed by attending physicians supervising each resident during her rotation through a particular clinical area, and through meetings of the Pediatrics Education Committee ("PEC"), which convenes approximately monthly to discuss residents' progress and performance and documents its discussions in meeting minutes.

The parties dispute the quality of Qureshi's performance in the Program, and argue extensively about the significance of the documentation, in both rotation evaluations and PEC minutes, of her performance. Qureshi recounts a few isolated incidents of lateness or inattentiveness to work responsibilities (such as not answering a page or an email in a timely fashion), which were quickly addressed, corrected, and never mentioned again either in verbal warnings or in her rotation evaluations or other written reviews. Defendants, on the other hand, recount a mounting concern about Qureshi's professionalism, based on chronic tardiness, emotional outbursts, and indications of instability in her personal life. Qureshi also avers that other residents had more severe tardiness problems, for which they were placed on probation. Further, Qureshi disputes any concern on the part of Program staff about her emotional state and demeanor at work, since this was never mentioned to her either verbally or in writing, she was allowed to

---

is unwarranted. *See Wolde Meskel v. Vocational Instruction Project Cmty. Servs., Inc.,* 166 F.3d 59, 63 (2d Cir.1999). Here, it is quite clear that if Defendants' actions in fact caused the harm alleged, the damage Qureshi suffered is likely well over the jurisdictional minimum of $75,000.

2. The factual recitation derives from the following documents on the record of Defendants' motion: Defendants' Rule 56.1 Statement; Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl's R. 56.1 Stmt."); the Deposition of Ansa Qureshi taken February 2 and March 18, 2005, attached as Exhibit 6 to the Declaration of Jason Bernbach ("Bernbach Decl."); the Deposition of David Rubin, taken on March 17, April 1, and May 10, 2005, attached as Exhibit 1 to the Bernbach Decl. and as Exhibit 8 to the Affidavit of Terri L. Ross ("Ross Aff."); Letter of Ansa Qureshi dated January 16, 2004 ("Qureshi Letter"), attached as Exhibit 50 to the Ross Aff.; Program Requirements for Residency Education in Pediatrics ("Program Requirements"), attached as Exhibit 45 to the Bernbach Decl.; Letter from Dr. David Rubin to Dr. Gail McGuinness dated April 16, 2004 ("April 16 Letter"), attached as Exhibit 23 to the Ross Aff.; Letter from Dr. David Rubin to Dr. Gail McGuinness dated April 23, 2004 "(April 23 Letter"), attached as Exhibit 53 to the Ross Aff. Except as specifically quoted or otherwise cited, no further reference to these documents will be made.

continue treating patients, and she was not referred to the Hospital's employee assistance program, which was charged, according to Qureshi, with providing assistance to physicians with emotional problems. Further, Qureshi consistently received satisfactory to exemplary rotation evaluations and semi-annual reviews.

By the spring of 2003, Qureshi began to complain about her work schedule and expressed an interest in leaving the Program. In the summer of 2003, after Qureshi had completed a year in the Program, she took a 12–week leave of absence. The parties dispute the reasons for this leave and the terms on which it was arranged. The parties agree that Rubin suggested that Qureshi take the leave. Qureshi returned to the program as a third-year resident after the 12–week leave.

According to Defendants, Qureshi's Program supervisors again began to have concerns about her professionalism by the beginning of 2004. Qureshi denies this. Part of her supervisors' concern was apparently based on Qureshi's alleged failure to start research on a required research project by the middle of her third year of residency. Qureshi avers that her supervisors had evaluated her progress toward completion of this project as satisfactory, and that Rubin, Fagan, and Fox were well aware of the satisfactory state of her progress.

In January 2004, Program staff received a voicemail message from someone identifying herself as Mrs. Omar, who reported that she had a restraining order against Qureshi. Fagan met with Qureshi about this incident, and Qureshi explained that Mrs. Omar was her former landlord, denied the existence of any restraining order, and submitted a written explanation of the events leading up to the voicemail message. While Qureshi disputes the Defendants' characterization of the written explanation, it indicates that Qureshi's housing situation was so unstable that she could not receive mail there, and that the arrangement she had made for the receipt of her mail, including responses to fellowship applications, was also unstable. It also indicates that she had no telephone service at home.

In February 2004, Qureshi and Dr. Marlon Ali ("Ali"), then the chief resident, discussed the time off Qureshi was requesting to prepare for a fellowship interview. Although the parties dispute the details of this conversation, they agree that Ali told Qureshi she should reconsider her career choice, and Qureshi began to cry. In February or March of 2004, Qureshi requested time off to attend a hearing at the Metropolitan Transportation Authority regarding an incident in which she allegedly improperly entered the subway.

At the February 20, 2004 PEC meeting, the PEC mandated the following for Qureshi: 1) timely responses to pages; 2) regular attention to email; 3) progress on her research project; 4) proof of participation in counseling.

The parties dispute whether Qureshi was having problems in these areas. Specifically, Qureshi denies that there was any indication that she was in need of counseling or that Program staff took any actions they would be expected to take with respect to a resident having any problem or condition that would require counseling. Indeed, Rubin continued to give positive fellowship recommendations about Qureshi during this time. However, the parties do not dispute that these mandates were issued and that Qureshi was informed of them.

At some point shortly before or after the February 20, 2004 PEC meeting, Qureshi informed Program staff that she was dissatisfied and wished to leave the Program.

In the weeks following that meeting, Qureshi had a number of meetings with Program staff. The content of those meetings is largely disputed, although the parties agree that Qureshi was told during these meetings that as of that point, she was not being failed.

Qureshi resigned from the Program on March 29, 2004, having completed six months of her third year of residency. According to Qureshi, she resigned because she believed that she would receive a failing grade from Rubin. The Program did in fact rate her "unsatisfactory" in the core competency of professionalism, due to her failure to address what staff perceived as deficiencies in professionalism in the manner outlined by the Program in the February 20, 2004 PEC meeting.

B. *THE ALLEGEDLY DEFAMATORY STATEMENTS*

Qureshi alleges four instances of defamation, one of which comprises several publication incidents that are materially identical for purposes of analysis.

First, at a meeting with Qureshi's co-workers following her departure, Rubin informed these co-workers that Qureshi had left for "personal reasons." Second, apparently in the hope that Qureshi's family might help her address the problems Rubin perceived, Rubin contacted Qureshi's father by telephone and informed her that Qureshi had left the Program, that she was feeling sad and that she needed therapy. The parties dispute whether this was Rubin's personal or professional opinion.

Third, Rubin submitted two letters to Dr. Gail McGuinness, Senior Vice President of the ABP, along with forms entitled "Resident Incomplete Training Information" which a residency program is required to submit when a resident leaves a program before its completion. The April 16 Letter stated in part

> there have been ongoing problems noted in Professionalism. Dr. Qureshi tried to address these issues with a leave of absence from this program from July 1, 2003–October 1, 2003. Unfortunately, ongoing issues related to Professionalism have raised questions regarding Dr. Qureshi's competence. Furthermore, Dr. Qureshi refused to consider the strong recommendation of the Department of Pediatrics Education Committee that she seek professional mental health therapy for issues, which were negatively affecting her responsibilities as a resident. It is for this reason that she has received an "Unsatisfactory" for professionalism.

(April 16 Letter.) The April 23 Letter reiterated the above-quoted passage almost verbatim with the exception of the last sentence, adding:

> This lack of insight into her problems was most troubling to the Committee and contributed to their decision to grant an "Unsatisfactory" for Professionalism. Most troubling was her decision to leave the program as a solution to her rejection of the Committee's recommendation.
>
> At this time, we would strongly recommend a 6–month period of observation, which would involve professional mental health evaluation and treatment. Dr. Qureshi is an intelligent, capable physician and I am optimistic about her future as a pediatrician. However, at this time she needs assistance in personal problems, which have and will impact patient care.

(April 23 Letter.)

The parties dispute whether the Program benefited from the submission to the APB. Specifically, Qureshi claims that the submission is suspicious because she was

consistently given satisfactory and higher ratings in professionalism before her departure, she was never restricted in treating patients despite what the Program allegedly perceived as serious problems in her performance, and she was consistently given positive recommendations to other programs. Qureshi maintains that her departure, coupled with the departure of another resident about a year and a half earlier, evidenced attrition problems with the Program that would cause the ACGME to be concerned. ACGME policy states that "a high rate of resident attrition from a program over a period of years will be a cause of concern to the R[esidency] R[eview] C[ommittee]." (Program Requirements at 20.) Thus Qureshi asserts that the letters and forms indicating her unsatisfactory performance were submitted to the APB in retaliation for Qureshi's putting the program in a difficult position and to cover up flaws in the Program by blaming Qureshi's departure on her own personal failings. However, Qureshi admits that Rubin, Fox and Fagan were not aware of the policy. (Pl's R. 56.1 Stmt. ¶ 51.)

Finally, Rubin communicated with directors at other residency programs Qureshi applied to after her departure from the Program. In response to their requests for information about Qureshi, Rubin forwarded to at least one program director copies of at least some of his correspondence with the APB regarding Qureshi's failing grade in professionalism. Qureshi asserts that Rubin did not comply with the program directors' requests for Qureshi's formal evaluations.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and ad-

missions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A district court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted); *see General Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1452 (2d Cir.1991). To survive a motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

On a motion for summary judgment, the Court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir.2003) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). However, where the movant has made a properly supported summary judgment motion, the opposing party cannot simply rely upon the allegations or denials of her pleadings. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998) (citing *D'Amico v. City of New York*, 132 F.3d

145, 149 (2d Cir.1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is ... insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

## B. *DEFAMATION*

■ Under New York law,[3] a plaintiff alleging defamation must show "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, [and that] ... either cause[s] special harm or constitute[s] defa-

mation per se." *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1999) (citing Restatement (Second) of Torts § 558 (1977)). The New York Civil Practice Law and Rules mandate that in actions for defamation, "the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally." N.Y. C.P.L.R. 3016(a) (McKinney 2003).

Defendants argue that the statements made cannot be characterized as defamatory, that they are in any case non-actionable statements of opinion, and that they are protected by the qualified privilege

**3.** The parties assume without discussion that New York substantive law applies to this defamation action. In doing so, the parties fail to consider New York conflict of laws rules. *See Celle v. Filipino Reporter Enters., Inc.,* 209 F.3d 163, 175 (2d Cir.2000). When a federal court sits in diversity, it applies the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In tort cases such as this one, "New York applies the law of the state with the most significant interest in the litigation." *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999) (citing *Padula v. Lilarn Props. Corp.,* 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001, 1002 (1994)). In making this inquiry, New York distinguishes between "conduct regulating" and "loss allocating" rules. *Id.* Where a conduct regulating rule such as defamation is in issue, New York courts apply the law of the place of the tort. *Id.* However, determining where the tort of defamation occurs is not always a straightforward task. "[T]he state of the plaintiff's domicile will usually have the most significant relationship to the case" in a defamation action, because it is assumed that the plaintiff suffers the most damage to her reputation in her home state. *Reeves v. Am. Broad. Co.,* 719 F.2d 602, 605 (2d Cir.1983). However, this preference is not conclusive. *See Lee,* 166 F.3d at 545.

In cases where, as here, publication of the allegedly defamatory material has occurred in multiple states, courts have applied a multifactor test to determine the place of the tort.

*See, e.g., Davis v. Costa–Gavras,* 580 F.Supp. 1082, 1091 (S.D.N.Y.1984). These factors include the plaintiff's domicile, the location of the plaintiff's activity which gave rise to the alleged defamation, the defendants' domicile, and the place from which publication of the allegedly defamatory statements occurred. *See Weinstein v. Friedman,* 94 Civ. 6803, 1996 WL 137313, at *8 (S.D.N.Y. March 26, 1996). Here, the allegedly defamatory statements were made in New York and publication occurred in New York, Texas, Wisconsin, Oklahoma (where Qureshi applied for residencies after leaving the Program), North Carolina (where the American Board of Pediatrics is located), and possibly Illinois (where Qureshi's father apparently resided at the time of Rubin's telephone call to him). The vast majority, if not all, of the events giving rise to the alleged defamatory statements occurred in New York, where Qureshi was a resident in Defendants' residency program, and Defendants reside in New York. Qureshi resides in Illinois.

Based on the above factors, the Court determines that New York substantive law applies in this action, because New York is the state with the greatest interest in the matter. Further, "the parties in their briefs have cited New York law, thus signaling their consent to its application." *Hernandez v. GPSDC (New York) Inc.,* No. 04 Civ. 127, 2006 WL 563308, at *8 (S.D.N.Y. March 9, 2006) (citing *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000)).

afforded to communications between parties with a common interest. On the other hand, Qureshi argues that the statements were express or implied factual assertions that were defamatory per se and made with malice, thereby defeating any qualified privilege that may attach to them.

### 1. Defamation Generally

■ The threshold inquiry is whether the statements made are potentially defamatory. Only words reasonably susceptible of defamatory meaning are actionable. See Aronson v. Wiersma, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, 1139 (1985). Under New York law "whether particular words are defamatory presents a legal question to be resolved by the court." Golub v. Enquirer/Star Group, Inc., 89 N.Y.2d 1074, 659 N.Y.S.2d 836, 681 N.E.2d 1282, 1283 (1997) (citation and internal quotation marks omitted). A statement has a defamatory meaning if it " 'tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.' " Foster v. Churchill, 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153, 157 (1996) (quoting Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1305 (1977)).

Courts are not to render statements actionable by giving them a "strained or artificial construction," Dillon, 704 N.Y.S.2d at 5 (citing Silsdorf v. Levine, 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716 (1983)), nor are they to interpret potentially defamatory statements " 'in their mildest and most inoffensive sense to hold them nonlibelous.' " Davis v. Ross, 754 F.2d 80, 83 (2d Cir.1985)(quoting November v. Time, Inc., 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126, 128 (1963)).

■ Defendants argue that Rubin's statement to Qureshi's fellow residents asserting that Qureshi left for "personal reasons" is not susceptible of a defamatory meaning. The Court agrees. Such a reading of the comment would give it a strained or artificial construction. See Dillon 704 N.Y.S.2d at 5. There is no evidence on the record to suggest that Rubin intended a defamatory connotation or that the statement was understood by its audience to be disparaging. Absent more ample context for Rubin's remark, it is difficult to conceive how a bare statement that a resident has left a medical training program for "personal reasons" can objectively and reasonably satisfy the rigorous standard articulated in Foster. "Personal reasons" may be grounded on numerous considerations that carry no necessarily defamatory connotation. For instance, they may be financial. The reasons may entail the health of the individual or of a close relative, or involve an emotional commitment to another person or a move to a distant location. In short, there is nothing inherently harmful about such a general remark that would expose the person to "public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons." Foster, 642 N.Y.S.2d 583, 665 N.E.2d at 157. Ironically, publishing the truth that Qureshi had been mandated to seek counseling and otherwise to remedy actual or perceived deficiencies in professionalism, arguably would have been more likely to evoke such a potentially adverse response. To this extent, Rubin's remark may have served more to spare Qureshi from opprobrium than to cause it.

Indeed, an explanation that a worker has left a job for "personal reasons" is probably commonplace among employers. In that context the statement serves as a shorthand phrase routinely used as a

shield, a graceful way to convey that the speaker is not able to say more, and thus to discourage further inquiry, when a more detailed answer may contain information that possibly could be deleterious to an employee and that potentially could subject the speaker to litigation, well-founded or not. A finding that as a matter of law such an explanation, presumably the response that the employee would regard in his best interests under the circumstances, would neither cushion the employee from unnecessary negative comment nor protect the employer from lawsuits, but would in fact give ground for a defamation action and more broadly open a significant source of new litigation, would not constitute a reasonable reading of the statement in question.

Based on the facts adduced in discovery, the Court finds that there is no material issue as to whether Rubin's "personal reasons" remark was " 'reasonably susceptible of [a] defamatory connotation,' " *Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir.1994) (quoting *James v. Gannett*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 353 N.E.2d 834, 837 (1976)), as no reasonable listener or "right-thinking person[ ]," *Foster*, 642 N.Y.S.2d 583, 665 N.E.2d at 157, could have understood it to be defamatory in the context in which the words were spoken. As elaborated below, however, even if the Court were to find that the statement was susceptible of a defamatory meaning, it would not be actionable.

### 2. *Protection for Opinions*

■ Under both New York and federal law, statements of pure opinion are not actionable as defamation. *See Gross v. New York Times Co.*, 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163, 1166 (1993). This seemingly simple proposition belies an often complicated task of distinguishing between potentially actionable statements of fact and nonactionable expressions of opinion. *See Brian v. Richardson*, 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1129 (1995). Under New York law, the task is one for the Court. *See Levin v. McPhee*, 119 F.3d 189 (2d Cir.1997); *600 W. 115th St. v. Von Gutfeld*, 80 N.Y.2d 130, 589 N.Y.S.2d 825, 603 N.E.2d 930, 934 (1992). The inquiry

> entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross*, 603 N.Y.S.2d 813, 623 N.E.2d at 1167 (citations and internal quotation marks omitted).

■ In addition, New York has retained the common-law distinction between assertions of opinion that imply a basis in facts not disclosed to the reader or listener, often termed mixed opinion, which are actionable, and statements of opinion "accompanied by a recitation of the facts on which [they are] based or [statements] that do[ ] not imply the existence of undisclosed underlying facts," referred to as pure opinion, which are not actionable. *Id.* at 1168. " 'The actionable element of a "mixed opinion" is not the false opinion itself—it is the implication that the speaker knows certain facts, unknown to [her] audience, which support [her] opinion and are detrimental to the person about whom [s]he is speaking.' " *Brown v. Albany Citizens Council on Alcoholism, Inc.*, 199 A.D.2d 904, 605 N.Y.S.2d 577, 578 (App. Div.3d Dep't 1993) (alterations in original)

(citing *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550, 553 (1986)).

As Defendants point out, some courts applying New York law have found that assessments of a current or former employee's work performance are nonactionable opinion. *See, e.g., Ott v. Automatic Connector, Inc.,* 193 A.D.2d 657, 598 N.Y.S.2d 10, 12 (App. Div.2d Dep't 1993). However, most of the authorities cited involve publication of statements internal to the employing entity. *See, e.g., Rodriguez v. Am. Friends of Hebrew Univ.,* No. 96 Civ. 240, 1998 WL 146227, at *8–9 (S.D.N.Y. March 25, 1998) (statement of one supervisor to another); *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201, 202–03 (App. Div. 4th Dep't 1992) (same); *Williams v. Varig Brazilian Airlines,* 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (App. Div. 1st Dep't 1991) (memorandum of one supervisor to another and termination letter from supervisor to plaintiff); *Goldberg v. Coldwell Banker, Inc.,* 159 A.D.2d 684, 553 N.Y.S.2d 432, 433 (App. Div.2d Dep't 1990) (memorandum from employee to his supervisor regarding retained attorney); *Hollander v. Cayton,* 145 A.D.2d 605, 536 N.Y.S.2d 790, 791 (App. Div.2d Dep't 1988) (statements made at internal hospital meetings by president of professional staff regarding chairman of pediatrics department); *but see Gavenda v. Orleans County,* No. 95–CV–0251E, 1997 WL 65870, at *8 (W.D.N.Y. Feb. 10, 1997) (statement by superior to member of the public, statement by another superior to coworker, and third superior's deposition testimony considered statements of opinion); *Amodei v. New York State Chiropractic Ass'n,* 160 A.D.2d 279, 553 N.Y.S.2d 713, 716 (App. Div. 1st Dep't 1990) (statement made in referral to professional disciplinary board found to be protected opinion).

One rationale for these precedents is perhaps that colleagues have the same exposure or experience with the employee in question, so that underlying facts forming the basis of opinion are shared and the audience assumes the statement is one of opinion. Indeed, "[i]nternal employment reviews ... may be protected speech, either as an expression of opinion, or in recognition of the principle that '[a]n employer has the right to assess the employee's performance on the job without judicial interference.'" *Dillon,* 704 N.Y.S.2d at 5 (last alteration in original) (citing *Ott,* 598 N.Y.S.2d at 11). On the other hand, some courts have found that even statements made within the employing entity are actionable mixed opinion. *See, e.g., Brown,* 605 N.Y.S.2d at 578 (finding that members of non-profit board would assume executive director and personnel committee chair had undisclosed factual basis for their opinions).

In contrast, when the publication is made externally, especially to other potential employers, a licensing board or the like, assessments of work performance have been considered actionable assertions of fact or of mixed opinion. *See, e.g., Purgess,* 33 F.3d at 140; *Davis,* 754 F.2d at 86. Indeed, an employment reference is perhaps the prototypical situation in which a reasonable reader or listener assumes that the speaker has a factual basis for her opinion, in the form of interaction with the employee over the period of employment, which is not shared by the reader or listener.

Of course, although context matters, whether a statement is one of fact or opinion depends also on the content of the statement itself.

■ Applying this analysis, the Court finds that Rubin's statements to Qureshi's father that she was "feeling sad" and "needed to have therapy," taken as a

whole and in the context in which they were made, could be actionable statements of mixed opinion. Standing alone, the statement that Qureshi was feeling sad lacks a precise meaning and is nothing more than Rubin's assessment of Qureshi's emotional state, thus is incapable of being proven true or false. However, "in distinguishing between actionable factual assertions and nonactionable opinion, the courts must consider the content of the communication as a whole, as well as its tone and apparent purpose." *Brian,* 637 N.Y.S.2d 347, 660 N.E.2d at 1129–30. The immediate context was a phone call to Qureshi's father, to whom Rubin had presumably never spoken before, regarding Mr. Qureshi's adult daughter. The apparent purpose was to convey concern and to enlist Qureshi's parents in seeing that she got help. A reasonable listener receiving a phone call from his adult child's former employer, who is also a medical doctor, might well assume that the employer/doctor has a factual basis for his opinion that the listener's child is in need of therapy. In fact the reasonable listener might assume that the speaker's statement is based on a medical diagnosis and not based only on concern as an employer and fellow parent.

■ However, the statement Rubin made to Qureshi's fellow residents is one of opinion. Working alongside Qureshi in the residency program, these colleagues had ample opportunity to observe Qureshi's behavior and demeanor and had likely spent as much, if not more, time with Qureshi as Rubin had. Thus, both the statement's immediate context, an informal meeting to discuss Qureshi's departure, and their broader context, a communication by a supervisor in an educational and employment program to the plaintiff's former colleagues, "signal to . . . listeners that what is being . . . heard is likely to be

opinion, not fact." *Steinhilber,* 508 N.Y.S.2d 901, 501 N.E.2d at 554 (citation and internal quotation marks omitted).

■ "The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." *Id.* at 553. The statements to the ABP and to other residency programs were just such statements. Assessments of work performance are inherently evaluative; that is, a reasonable hearer or reader would assume that the speaker's assessment has some factual basis (for instance, the number of times an employee was late to work), but would also assume that she herself might come to a different conclusion or assessment based on the same set of facts. The ABP relied on residency programs to inform them of any performance problems with residents and to provide them with an evaluation when a resident left a program before completing it. The directors of other residency programs sought Rubin's recommendation of Qureshi based on his year and a half of experience as the Director of the Program in which she was a resident. Certainly all of these parties to whom publication was made reasonably assumed that Rubin had an undisclosed factual basis for the opinion he asserted, based on the context and circumstances of these communications.

### 3. Qualified Privilege

■ A qualified privilege is afforded statements made in good faith regarding a matter in which the speaker has an interest or duty that is shared with the listener or reader. *See Stukuls v. State,* 42 N.Y.2d 272, 397 N.Y.S.2d 740, 366 N.E.2d 829, 833 (1977). The interest or duty need not be a legal one, but may be

of a moral or social character. *See id.* Such statements are protected for "the common convenience and welfare of society, that is, the recognition that on certain occasions the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability ... outweighs the harm that may be done to the reputation of others." *Garson v. Hendlin,* 141 A.D.2d 55, 532 N.Y.S.2d 776, 780 (App. Div. 2nd Dep't 1988) (alteration in original) (citations and internal quotation marks omitted). Qualified privileges are broadly applied; the "common interest" privilege applies when the parties "have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Anas v. Brown,* 269 A.D.2d 761, 702 N.Y.S.2d 732, 734 (App. Div. 4th Dep't 2000) (citing *Garson,* 532 N.Y.S.2d at 780).

■ Although it may be unusual for a teacher or employer to contact the parent of his adult student or employee, Qureshi has adduced no evidence to support anything but an innocent motive for Rubin's contact with her father. This communication is thus shielded by a qualified privilege.

■ The New York Court of Appeals has determined, in a context quite similar to the instant one, that statements made to medical licensing boards and to another physician about the performance of an employee are subject to qualified privilege. In *Buckley v. Litman,* 57 N.Y.2d 516, 457 N.Y.S.2d 221, 443 N.E.2d 469 (1982), the defendant, a physician, submitted a letter to the Physician's Assistants Licensing Board which stated that he believed the plaintiff, a physician's assistant formerly employed by the defendant, had stolen confidential patient files from the defendant's office. The defendant sent a copy of this letter to the plaintiff's current employer, another physician. The court found that the communication with the licensing board "was subject at a minimum to a qualified privilege, as a communication addressed to an official body charged with responsibility for consideration and processing of complaints of professional misconduct on the part of physician's assistants." *Id.* at 470. The court likewise found that the communication with the plaintiff's current employer was protected by a qualified privilege based on a common interest relating to patient care.

Other New York courts have found that references and other communications by medical residency programs regarding their residents are subject to a qualified privilege. *See, e.g., Norwood v. City of New York,* 203 A.D.2d 147, 610 N.Y.S.2d 249, 250 (App. Div. 1st Dep't 1994) (qualified privilege defense appropriate in trial regarding statements by plaintiff's former residency program to American Board of Internal Medicine and hospital where plaintiff was conditionally accepted for a fellowship); *Roth v. Beth Israel Med. Ctr.,* 180 A.D.2d 434, 579 N.Y.S.2d 373, 374 (App. Div. 1st Dep't 1992) (communication regarding anesthesiology resident's suspension to Office of Professional Medical Conduct protected by qualified privilege based on shared interest in the performance of the hospital's residents); *Meller v. Tancer,* 174 A.D.2d 374, 571 N.Y.S.2d 214, 216 (App. Div. 1st Dep't 1991) (statement by director of residency program regarding former resident's character and medical skill to prospective employers subject to qualified privilege).

Defendants, the ABP, and the directors of other residency programs shared an interest in the training of residents, the provision of high-quality treatment to patients, and in maintaining high standards in the profession. Rubin's communications to the ABP and to directors of other resi-

dency programs are therefore subject to a qualified privilege, and thus not actionable, absent a showing of malice on Rubin's part.

### 4. *Malice*

Once qualified privilege has been established, a plaintiff must show that defendants acted with malice in order to overcome the privilege. That is, a plaintiff must come forth with some evidence that the statements were "false and that the defendant was actuated by express malice or actual ill-will." *Stukuls,* 397 N.Y.S.2d 740, 366 N.E.2d at 834. Evidence of the falsity of a statement alone is insufficient to raise an issue of fact as to malice. *Kasachkoff v. City of New York,* 107 A.D.2d 130, 485 N.Y.S.2d 992, 996 (App. Div 1st Dep't 1985). Malice in this context means " 'personal spite or ill will, or culpable recklessness or negligence.' " *Shapiro v. Health Ins. Plan of Greater New York,* 7 N.Y.2d 56, 194 N.Y.S.2d 509, 163 N.E.2d 333, 336 (1959) (quoting *Hoeppner v. Dunkirk Printing Co.,* 254 N.Y. 95, 172 N.E. 139, 142 (1930)).

As mentioned above, there is no evidence raising a material issue of fact regarding Rubin's motive in contacting Qureshi's father. It is undisputed that Rubin called Qureshi's father in good faith.

■ In essence, Qureshi's evidence for malice in the statements Defendants made to the APB and other residency program directors amounts to an argument that (1) Defendants' reactions to a few isolated incidents of less-than-stellar performance were overblown; (2) Defendants in fact were not of the opinion that Qureshi was deficient in professionalism, because they continually gave her satisfactory ratings in professionalism in all written and oral evaluations that were shared with her; and (3) she received a failing grade in professionalism, and the subsequent poor references,

because Defendants were concerned that her departure would reflect badly on the Program in the eyes of the ACGME. The first contention is irrelevant. That Defendants were concerned about Qureshi's professionalism based on a set of incidents which other supervisors might not find so deficient has no probative bearing in this inquiry. In considering whether Defendants acted with malice, the Court must assess their motive for making the statements. For this purpose the inquiry does not require a determination of whether the opinions on which the statements were based were objectively reasonable given the factual circumstances.

Qureshi's second contention also misses the mark. Although the Program required ongoing evaluation of residents and documentation of progress, the effectiveness and proper use of that evaluation mechanism is not before the Court in this action for defamation. The absence of more documentation than Defendants already had of Qureshi's alleged deficiencies in professionalism does not raise an issue of material fact whether Defendants acted with malice. Qureshi goes to great lengths endeavoring to raise issues of fact tending to show that Rubin did not in fact believe that she had personal problems, needed therapy, or had problems in professionalism, because some of his actions (including continuing to allow Qureshi to treat patients, giving her positive fellowship references, and the like) were, she argues, inconsistent with this belief. However, none of this evidence raises a material issue of fact regarding the good faith of Rubin's belief in the truth of the allegedly defamatory statements. In any case, malice does not turn on the truth or falsity of the statement, but on the intent of the speaker.

Finally, even after the close of extensive discovery, Qureshi's theory regarding De-

fendants' ulterior motive for the failing grade and subsequent publication of its justification remains just that—a theory. A summary judgment motion puts the plaintiff's theory of the pleadings to a factual test. As stated above, it is not enough to respond to the motion with more theory, speculation or conclusions. Qureshi has not adduced specific facts that, if true, would tend to prove this theory or any other theory showing that Defendants acted out of malice. She has introduced evidence of an ACGME policy that excessive resident attrition rates would cause concern. In the absence of evidence to the contrary, a program director and other program leaders may be assumed to be aware of the policies governing their program, although even this assumption does not raise an issue of fact regarding whether fear of the repercussions of such a policy motivated allegedly defamatory statements. However, Qureshi herself asserts that it is undisputed that Rubin, Fox and Fagan did *not* know of the policy. Nor does Qureshi explain how, if this fear of ACGME policy were the motive, Defendants' publication of the failing grade would address the policy, in other words, evidence that attrition did not include departures from the Program by reason of failing grades. Thus Qureshi has not raised any issue of material fact regarding Defendants' reliance on this ACGME policy in their decision to deem her performance unsatisfactory and to share that evaluation with the APB and other residency program directors.

For the reasons set forth above, the Court finds that no genuine issue of material fact exists with respect to Qureshi's defamation claim.

### III.  *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the Court's Order dated March 29, 2006 is amended to incorporate the discussion set forth above; and it is further

**ORDERED** that the motion for summary judgment (Docket No. 19) of defendants St. Barnabas Hospital Center and David Rubin, M.D., ("Defendants") is GRANTED.

**SO ORDERED.**