OPINION OF THE COURT
Marcy S. Friedman, J.
In this action, plaintiff Missy Chase Lapine seeks damages from defendant Jerry Seinfeld for slander. Plaintiff also seeks damages from defendant HarperCollins Publishers, Inc. (HarperCollins) for breach of implied contract and for misappropriation and unfair competition. Defendants Seinfeld and Harper-Collins move, pursuant to CPLR 3211 (a) (1) and (7), to dismiss all of the claims.
The action arises out of the publication of two cookbooks. In April 2007, plaintiff published The Sneaky Chef: Simple Strategies for Hiding Healthy Foods in Kids’ Favorite Meals (The Sneaky Chef). In October 2007, defendant publisher HarperCollins released Deceptively Delicious: Simple Secrets To Get Your Kids Eating Good Food (Deceptively Delicious), written by Jessica Seinfeld, who is married to Jerry Seinfeld. (Complaint lili 2-4-)
The acts underlying this case were the subject of a prior federal lawsuit. The Second Circuit affirmed the grant of summary judgment dismissing plaintiff’s copyright infringement, trademark infringement, and trademark dilution claims. Concluding that the two books were not “substantially similar” for copyright infringement purposes, the court reasoned
“that the ‘total concept and feel’ of Deceptively Delicious is very different from that of The Sneaky Chef. . . . Deceptively Delicious lacks the extensive discussion of child behavior, food philosophy, and parenting that pervades The Sneaky Chef. . . . While The Sneaky Chef assumes greater familiarity with cooking, recommends thirteen methods for hiding healthy foods, and provides recipes for multiple-ingredient purees, Deceptively Delicious instructs readers about only single-ingredient purees and contains more basic instructions.” (Lapine v Seinfeld, 375 Fed Appx 81, 83-84 [2d Cir 2010], affg 2009 WL 2902584, 2009 US Dist LEXIS 82304 [SD NY 2009].)
Claims against HarperCollins
In the instant action, the essence of plaintiffs claims against HarperCollins is that Deceptively Delicious wrongfully “used *739 Lapine’s idea for a book about hiding healthy food in the foods that kids love to eat.” (Complaint 1Í 4.) The complaint alleges that plaintiff developed not only this “innovative” idea for a cookbook, but also “original ideas for combining ingredients,” including adding vegetable purees to foods that children like. (Id. HIT 16-18.)[1]
The claims against HarperCollins are also based on the following material allegations: Plaintiff, in response to a solicitation from a vice-president of HarperCollins, sent a book proposal, including excerpted chapters from The Sneaky Chef manuscript, to HarperCollins in February 2006, and again, through her agent, in May 2006. (Id. 1T1T19-21.) The book proposal was the culmination of plaintiffs research into “methods for getting children to eat healthier foods,” resulting in “an innovative solution: camouflage healthy foods so that children will eat them without realizing or objecting.” (Id. 1Í16.) Both submissions were rejected, but HarperCollins retained the book proposal, including parts of the manuscript. (Id. lili 20, 22.) Subsequently, another publisher accepted plaintiffs proposal and published The Sneaky Chef in April 2007. (Id. 1Í1Í 23, 24.) In May 2007, plaintiff “observed blatant similarities between the Seinfeld book and her book” when she obtained marketing materials for Deceptively Delicious and, through her publisher, brought the similarities to the attention of HarperCollins prior to publication. (Id. lili 25, 26.) With only “minor and insignificant modifications,” HarperCollins published Deceptively Delicious in October 2007. (Id. H1Í 28, 29.)
Plaintiff alleges that the books are substantially similar in numerous respects which include: similar introductions, written by doctors, calling attention to the problem of obesity; personal anecdotes about mealtime struggles; recommendations to “camouflag[e] carefully-selected pureed healthy foods inside children’s favorite foods”; reports of the authors’ own success in *740 “sneaking” healthy foods into the dishes children love, in order to reduce stress and increase familial happiness; and discussions of the arguments against deception. (Id. 1Í 30 [a]-[e], [1], [n].) Plaintiff also alleges similarities in the general approach presented by the books, including instructions to “get the right tools (e.g., a small food processor), get the ‘staple’ foods, make the vegetable and fruit purees once a week and refrigerate or freeze them, and then, at meal time, make the recipes using the purees.” (Id. 1Í 30 [k].) The complaint also includes a chart of the recipes in Seinfeld’s book which, plaintiff contends, call for adding the same puree to the same dish as in plaintiffs book. (Id. 1i 30 [p].)[2]
HarperCollins moves to dismiss the causes of action against it, on the grounds that they are defectively pleaded on their face and are preempted by the Federal Copyright Act.
Sufficiency of the Pleading
The standards for review on a motion to dismiss addressed to the face of the pleading are well settled. “[T]he pleading is to be afforded a liberal construction (see, CPLR 3026). [The court must] accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory.” (Leon v Martinez, 84 NY2d 83, 87-88 [1994]; see 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144 [2002].) However, wholly conclusory assertions are insufficient to support a cause of action. (See e.g. Welsh v Haven Manor Health Care Ctr., 15 AD3d 572 [2d Dept 2005]; Moskowitz v General Acc. Ins. Co., 179 AD2d 722 [2d Dept 1992]; see generally Caniglia v Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].)
Moreover, “the court is not required to accept factual allegations that are plainly contradicted by the documentary evidence or legal conclusions that are unsupportable based upon the undisputed facts.” (Robinson v Robinson, 303 AD2d 234, 235 [1st Dept 2003]; see also Water St. Leasehold LLC v Deloitte & Touche LLP, 19 AD3d 183 [1st Dept 2005], lv denied 6 NY3d 706 [2006].) When documentary evidence under CPLR 3211 (a) (1) is considered, “a dismissal is warranted only if the documentary evidence submitted conclusively establishes a defense to *741 the asserted claims as a matter of law.” (Leon, 84 NY2d at 88; Arnav Indus., Inc. Retirement Trust v Brown, Raysman, Millstein, Felder & Steiner, 96 NY2d 300 [2001].)
Here, plaintiff does not claim that a written or oral agreement was formed between herself and defendant HarperCollins. Instead, she alleges that an implied-in-fact contract existed, evidenced by the behavior of the parties. (Complaint 1Í 54.) Such a contract “may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the ‘presumed’ intention of the parties as indicated by their conduct.” (Jemzura v Jemzura, 36 NY2d 496, 503-504 [1975] [citations omitted].) An implied-in-fact contract “is just as binding as an express contract.” (Id. at 504.) Indeed, “an agreement by conduct does not differ from an express agreement except in the manner by which its existence is established.” (Matter of Boice, 226 AD2d 908, 910 [3d Dept 1996].)
The elements of an implied-in-fact contract are the same as the elements of an express contract: “consideration, mutual assent, legal capacity and legal subject matter.” (Maas v Cornell Univ., 94 NY2d 87, 94 [1999].) Conduct of the parties may manifest assent, and “a promise may be implied when a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it.” (Id.) Under settled law, a contract will not be found to have been formed if it is “not reasonably certain in its material terms.” (Cobble Hill Nursing Home v Henry & Warren Corp., 74 NY2d 475, 482 [1989]; Edelman v Poster, 72 AD3d 182, 184 [1st Dept 2010].)
In order to plead a claim for breach of contract, the proponent of the contract must accordingly allege “in nonconclusory language . . . , the essential terms of the parties’ . . . contract, including those specific provisions of the contract upon which liability is predicated, whether the alleged agreement was, in fact, written or oral, and the rate of compensation.” (Caniglia, 204 AD2d at 234 [citations omitted]; Matter of Sud v Sud, 211 AD2d 423, 424 [1st Dept 1995].)
In pleading her breach of contract cause of action, plaintiff relies on the bare allegation that “Lapine’s submission of Lapine’s Book proposal, with its original and novel ideas, was performed with the understanding and expectation, fully and clearly understood by HarperCollins, that Lapine would be reasonably compensated if HarperCollins made use of Lapine’s Book manuscript or Lapine’s ideas, recipes, or other matter it contained.” (Complaint IfH 55, 19.) She further claims that Har *742 perCollins breached this contract by using her ideas without compensating her. {Id. If 56.)
Plaintiffs complaint does not contain any factual allegations of conduct by HarperCoIIins showing that it assented to a contract with plaintiff. While the complaint alleges that HarperCoIIins solicited plaintiffs manuscript, plaintiff does not submit any authority and, indeed, does not argue that such solicitation, without more, is sufficient to plead an implied-in-fact contract. Notably, also, although price is an essential element of a contract (see e.g. Cobble Hill Nursing Home v Henry & Warren Corp., 74 NY2d 475 [1989], supra; Joseph Martin, Jr., Delicatessen v Schumacher, 52 NY2d 105, 109-111 [1981]), the complaint does not allege the amount of compensation plaintiff claims she is owed.
In her brief in opposition to the motion to dismiss, plaintiff contends that she is “seeking the legally appropriate compensation for the use of her ideas based on industry custom.” (Plaintiffs mem of law in opposition at 8.) However, the complaint itself does not plead the existence or features of industry custom. While the terms of an implied-in-fact contract may be defined, in appropriate circumstances, by industry custom, industry custom may not be relied upon where, as here, the pleading lacks any reference to it. (See Marraccini v Bertelsmann Music Group, 221 AD2d 95 [3d Dept 1996], lv denied 89 NY2d 809 [1997]; Markogianis v Burger King Corp., 1997 WL 167113, 1997 US Dist LEXIS 4452 [SD NY 1997].)[3]
In short, plaintiffs allegation that she submitted the proposal with the understanding that she would be paid reasonable compensation for the use of her ideas is wholly conclusory. It is therefore insufficient on its face to plead a cause of action for breach of implied contract.
*743 The complaint also fails to plead a cause of action for misappropriation of ideas.[4] This cause of action requires proof of a legal relationship between the parties. The relationship may be a fiduciary relationship or may be based on an express contract, an implied-in-fact contract, or a quasi contract. (Oasis Music v 900 USA, 161 Misc 2d 627, 631 [Sup Ct, NY County 1994]; Bulger v Royal Doulton, PLC, 2006 WL 3771016, 2006 US Dist LEXIS 91985 [SD NY 2006] [applying New York law]; Zikakis v Staubach Retail Servs., Inc., 2005 WL 2347852, 2005 US Dist LEXIS 21105 [SD NY 2005]; see also 75A NY Jur 2d, Literary and Artistic Property § 24.) In this case, as held above, plaintiff fails to allege sufficient facts to plead an implied-in-fact contract, and does not plead any other legally sufficient relationship to support a cause of action for misappropriation.
Novelty
HarperCollins argues that the breach of implied contract and misappropriation claims must be dismissed for the additional reason that the documentary evidence establishes that the idea that it allegedly wrongfully used lacks the novelty required to establish the claims.
The general rule is that “in order to recover under either theory, the plaintiff must establish the existence of a genuine issue as to the novelty and originality of the allegedly misappropriated ideas.” (Paul v Haley, 183 AD2d 44, 53 [2d Dept 1992], lv denied 81 NY2d 707 [1993].) The requirement of novelty is based on the principle that “when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is *744 based upon these two elements.” (Downey v General Foods Corp., 31 NY2d 56, 61 [1972].) “[I]deas which are not novel are in the public domain and may freely be used by anyone with impunity. Lack of novelty in an idea is fatal to any cause of action for its unlawful use.” (Paul, 183 AD2d at 52 [internal quotation marks and citations omitted].)
There is federal case law, interpreting New York law, which holds that while novelty and originality in general — i.e., to the world at large — must be shown in order to support a claim for misappropriation, a lesser showing of novelty to the buyer is required in order to support a claim for breach of implied contract. (See Nadel v Play-By-Play Toys & Novelties, Inc., 208 F3d 368 [2d Cir 2000].) In this court’s opinion, this federal holding is based on a misreading of Apfel v Prudential-Bache Sec. (81 NY2d 470 [1993]). Apfel modifies Downey to the extent of holding that the novelty of an idea need not be demonstrated in order to establish a claim for breach of implied contract based on use of an idea without compensation where, subsequent to disclosure of the idea, the parties have entered into a contract for use of the idea. Apfel reasons that in such circumstances, the buyer “has agreed that the idea has value, and the Court will not ordinarily go behind that determination. The lack of novelty, in and of itself, does not demonstrate a lack of value.” (81 NY2d at 478.) In contrast, as the Court further explains, where there has been no post-disclosure contract for use of the idea, proof of novelty is required to establish both that the user of the idea in fact obtained it from the plaintiff and that the idea had value, thus establishing consideration for the contract. (Id.) Apfel does state that where no post-disclosure contract has been made, “[a] showing of novelty, at least novelty as to the buyer,” addresses these two concerns as to whether the user obtained the idea from the buyer and whether it had value. (Id.) However, this statement is dictum, as Apfel involved a post-disclosure contract which was found to obviate the requirement of any showing of novelty.
The First Department has endorsed this reading of Apfel, holding that
“the Downey rule was only modified to the extent that a party who claims that an idea was misappropriated need not establish that the idea was novel and original if its value to the defendant was established by the creation of a contract between the parties following disclosure of the idea to the de *745 fendant.” (American Bus. Training Inc. v American Mgt. Assn., 50 AD3d 219, 223 [1st Dept 2008], lv denied 10 NY3d 713 [2008]; see also Marraccini v Bertelsmann Music Group, 221 AD2d 95 [1996], supra [adopting same reading of Apfel].)
The court accordingly holds that Nadel is not persuasive authority that the novelty to the buyer standard applies to a breach of implied contract claim based on the use of ideas. Moreover, the parties have not cited, and the court’s own research has not located, any New York appellate case holding that a novelty to the buyer standard applies to such a claim.[5]
In any event, HarperCollins argues that the documentary evidence establishes as a matter of law that plaintiffs idea was not novel under either novelty standard. “The question of whether an idea is sufficiently novel or original to merit protection under New York law is amenable to summary disposition.” (American Bus. Training Inc., 50 AD3d at 223, quoting Paul, 183 AD2d at 53.) Contrary to plaintiff’s contention, this issue may be determined on a motion to dismiss, provided that the documentary evidence conclusively establishes lack of novelty as a matter of law. (See authorities cited supra at 740-741.)
In determining whether an idea is novel and thus merits legal protection, courts have applied a “stringent test.” (Paul, 183 AD2d at 53.) An idea will not be considered novel if it is in the public domain. (Ferber v Sterndent Corp., 51 NY2d 782 [1980].) Nor will an idea be found novel where it is merely a “creative variation” on an existing theme (Marraccini, 221 AD2d at 98), or a “clever or useful adaptation of existing knowledge.” (Paul, 183 AD2d at 53; Surplus Equip, v Xerox Corp., 120 AD2d 582 [2d Dept 1986], lv denied 68 NY2d 606 [1986].) “Improvement of standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions — all the variations on a basic theme — partake more of the nature of elaboration or renovation than of innovation.” (183 AD2d at 53 [internal quotation marks and .citations omitted]; accord Oasis Music, 161 Misc 2d at 631-632; see also Nadel, *746 208 F3d at 378 [articulating similar criteria for determining novelty in general].) Further, an idea “may be so unoriginal or lacking in novelty that its obviousness bespeaks widespread and public knowledge of the idea, and such knowledge is therefore imputed to the buyer.” (Id.)
HarperCollins submits significant documentary evidence demonstrating that the idea for “sneaking” nutritious ingredients into children’s food was not novel at the time plaintiff submitted her proposal to HarperCollins.[6] As early as 1971, books extolling the virtues of “sneaky cookery,” answering the question “why be sneaky,” and addressing parents’ concerns about deception have been on the market. (Jane Kinderlehrer, Confessions of a Sneaky Organic Cook ... or How to Make Your Family Healthy When They’re Not Looking! [Rodale Press, Inc. 1971].) More recent publications also illustrate that purees can be premade and stored (Nava Atlas, Getting Sneaky, Vegetarian Times, at 47 [Nov./Dec. 2004]), and that pureed or otherwise mashed vegetables can be added to children’s favorite dishes. (Karen Bali and Sally Child, The Art of Hiding Vegetables: Sneaky Ways to Feed Your Children Healthy Food [White Ladder Press 2005].) Numerous other titles reflect the same ideas, tips, and tricks that plaintiff claims were her own innovation. (E.g. Chris Fisk, Sneaky Veggies: How to Get Vegetables Under the Radar and Into Your Family [Sterling Publ. Co. 2006]; Eating Green, the Devious Way, http:// daycaredaze.wordpress.com [Jan. 23, 2006]; Better Homes & Gardens, Kid Favorites Made Healthy: 150 Delicious Recipes Kids Can’t Resist! [Meredith Books 2003]; Donna Smith, Hidden Veggiesl, http://www.suitel01.com [Mar. 26, 2001].)
As demonstrated by the documentary evidence in this case, the idea of hiding healthy ingredients in foods likely to be accepted by children was, at best, a creative variation on preexisting ideas. (See Marraccini, 221 AD2d at 98.) The court accordingly holds that plaintiffs idea lacked the novelty in general necessary to support a cause of action for misappropriation. Even if a lesser standard of novelty to the buyer were to be found applicable to the breach of implied contract claim, plaintiffs idea also fails to satisfy that standard, as the idea was already in the public domain.
The court notes that nearly two years passed between plaintiffs submission of her proposal to HarperCollins and its *747 publication of Seinfeld’s book. Even if this case could nevertheless be viewed as one in which the timing of the publication raises the inference that HarperCollins used plaintiff’s idea, the question is not whether defendant may have used plaintiffs idea but whether plaintiff had an “enforceable property right” in the idea. (American Bus. Training Inc., 50 AD3d at 222.) Under the standards set forth above, plaintiff did not have such a right, given the lack of novelty of her idea, as well as her failure to plead a fiduciary or contractual relationship with defendant.
Preemption
Defendant argues that the complaint must be dismissed on the independent ground that plaintiffs claims are preempted by federal copyright law. The Copyright Act, 17 USC § 301 (a), provides, in pertinent part, that “all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that . . . come within the subject matter of copyright . . . are governed exclusively by this title.” The exclusive rights protected by the general scope of copyright under 17 USC § 106 include the rights of reproduction, the right to produce derivative works (also referred to as adaptation), performance, distribution, and display. Under the well settled test for preemption, a state law cause of action will be barred where “(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act” and “(2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law.” (Briarpatch Ltd., L.P v Phoenix Pictures, Inc., 373 F3d 296, 305 [2d Cir 2004], cert denied 544 US 949 [2005]; see also Computer Assoc. Intl., Inc. v Altai, Inc., 982 F2d 693, 716 [2d Cir 1992].)
Preemption will not, however, apply where “an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action.” (Computer Assoc., 982 F2d at 716 [internal quotation marks and citation omitted]; accord National Basketball Assn. v Motorola, Inc., 105 F3d 841, 850 [2d Cir 1997].) Thus, a state law claim will not be preempted “if the ‘extra element’ changes the nature of the action so that it is qualitatively different from a copyright infringement claim.” (Computer Assoc., 982 F2d at 716 [internal quotation marks and citations omitted].) Courts, at least in the Second Circuit, *748 have taken “a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim. Awareness or intent, for instance, are not extra elements that make a state law claim qualitatively different.” (Briarpatch Ltd,., 373 F3d at 306 [citations omitted].) In contrast, an extra element sufficient to avoid preemption may be found where the state law claim is based on breaches of confidential relationships or of fiduciary duties, or on use of trade secrets. (Computer Assoc., 982 F2d at 717; Orange County Choppers, Inc. v Olaes Enters., Inc., 497 F Supp 2d 541, 556 [SD NY 2007].)
In the instant action, there is no dispute that the first prong of the preemption test — the “subject matter” requirement — is met. While ideas are not copyrightable (Briarpatch Ltd., 373 F3d at 306; Lapine, 375 Fed Appx at 83), “both the copyrightable expression, and the uncopyrightable idea that underlies it, fall within the ‘subject matter of copyright’ for preemption purposes.” (Katz Dochrermann & Epstein, Inc. v Home Box Off., 1999 WL 179603, *3, 1999 US Dist LEXIS 3971, *7 [SD NY 1999]; accord Panizza v Mattel, Inc., 2003 WL 22251317, *3, 2003 US Dist LEXIS 17228, *7-8 [SD NY 2003].) Thus, although plaintiffs claims are based on a noncopyrightable aspect of her proposal — namely, her idea for the cookbook — such noncopyrightable material is a part of the copyrightable manuscript, and will be preempted by section 301 of the Copyright Act unless saved from preemption by an “extra element.”
There is considerable dispute among the federal courts about whether, or under what circumstances, a state law claim for breach of an implied-in-fact or other contract is preempted by the Copyright Act. Substantial authority articulates the broad proposition that the implied promise to pay for an idea constitutes the “extra element” necessary to avoid preemption. (E.g. Grosso v Miramax Film Corp., 383 F3d 965, 967 [9th Cir 2004], amended on other grounds 400 F3d 638 [2005], cert denied 546 US 824 [2005] [California claim for breach of implied-in-fact contract, involving promise to pay not for movie script but for idea “embodied in” script, is not preempted, as implied promise to pay for use of idea is the “extra element”]; Wrench LLC v Taco Bell Corp., 256 F3d 446, 456 [6th Cir 2001], cert denied 534 US 1114 [2002] [Michigan claim for breach of implied contract to pay for advertising concept is not preempted, as right to be paid for use of creative work is not one of the exclusive rights granted by copyright law, and “(t)he extra ele *749 ment is the promise to pay”]; Katz Dochrermann & Epstein, Inc., 1999 WL 179603, *4, 1999 US Dist LEXIS 3971, *11 [New York implied-in-fact contract for use of idea for ad campaign is not preempted, as “implied promise to pay for (plaintiffs) idea is entirely separate and apart from any claim for copyright infringement involving the literary work”].)
Other cases, although involving claims of implied promises to pay for the use of ideas, appear to be inconsistent with the above authority. While these cases do not explain their reasoning in any detail, they appear either to reject the proposition that a promise to pay for the use of an idea is sufficient to avoid preemption, or to construe the promises at issue as promises not to use copyrightable expression without authorization or as promises to pay for the use of copyrightable expression. (See e.g. Smith v New Line Cinema, 2004 WL 2049232, *5, 2004 US Dist LEXIS 18382, *13 [SD NY 2004] [although plaintiff claimed movie was “based on” his screenplay, not that the screenplay itself was used, court held that the “state law right to receive credit and compensation for the alleged unauthorized use of (plaintiffs) screenplay is equivalent to the exclusive rights protected by federal copyright law”]; Markogianis v Burger King Corp., 1997 WL 167113, 1997 US Dist LEXIS 4452 [1997], supra [distinguishing between implied contract claims for compensation for disclosure of ideas, which cases have held not preempted, and claims for implied promises not to use or copy material within the subject matter of copyright, which have been held preempted because not “qualitatively different” from copyright infringement].) Recently, in Montz v Pilgrim Films & Tel., Inc. (606 F3d 1153,1158 [9th Cir 2010], reh en banc granted 623 F3d 912 [2010]), the Ninth Circuit took pains to distinguish between a claim for breach of an implied promise to pay for the use of an idea, which its prior opinion in Grosso had held was not preempted, and the claim at issue in Montz for breach of an implied promise not to use the plaintiffs’ ideas without their consent. The court held the latter preempted because it “violated the plaintiffs’ exclusive rights to use and to authorize use of their work — rights equivalent to those of copyright owners.” Noting that the plaintiffs also alleged a right to compensation for the use of their ideas, the court nevertheless held that
“[t]he mere mention of such a right ... is not enough to ‘qualitatively distinguish’ the plaintiffs’ breach-of-implied-contract claim from a copyright *750 claim. The plaintiffs expected to receive a share of the profits and credit for use of their work, but only because they expected, as any copyright owner would, that their work would not be used without their permission.” {Id. [citation omitted].)
Another line of authority, developed in cases involving alleged breaches of licensing agreements and not generally expressly applied in cases involving promises to pay for ideas, holds that
“a breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff (such as unauthorized reproduction, performance, distribution, or display). However, if the breach of contract claim is based on allegations that the parties’ contract creates a right not existing under copyright law — a right based upon a party’s contractual promise — and the plaintiff is suing to protect that contractual right, then the claim is not preempted.” (American Movie Classics Co. v Turner Entertainment Co., 922 F Supp 926, 931 [SD NY 1996]; Wrench LLC, 256 F3d at 457 [finding breach of contract claim at issue not preempted, but noting that a contract claim would be preempted if the promise were only to refrain from acts such as reproduction, performance or distribution which the copyright law protects]; National Car Rental Sys., Inc. v Computer Assoc. Intl., Inc., 991 F2d 426, 432 [8th Cir 1993], cert denied 510 US 861 [1993] [same].)
However, this authority has also been criticized, with courts expressly rejecting American Movie Classics Co., based on the reasoning that “[t]ort-like copyright infringement claims, unlike breach of contract claims, do not require a promise by the defendant to refrain from using protected subject matter,” and that the contractual promise is therefore the extra element. (Architectronics, Inc. v Control Sys., Inc., 935 F Supp 425, 438-439 [SD NY 1996]; see also eScholar, LLC v Otis Educ. Sys., Inc., 387 F Supp 2d 329, 333 [SD NY 2005] [“(E)xistence of explicit contractual rights makes a breach of contract claim qualitatively different from a claim for copyright infringement”].)
Summarizing the extensive case law, a federal district court recently concluded that there are two lines of cases establishing
“contradictory hard-line rules. One, from American Movie Classics, holding that a breach of contract *751 claim is always preempted if the promise that the plaintiff seeks to enforce is a right guaranteed by the Copyright Act, and one, from Architectronics, stating that breach of contract claims need not be preempted.” (BanxCorp v Costco Wholesale Corp., 723 F Supp 2d 596, 614 [SD NY 2010].)
This court suggests, however, that at least some of the cases in the differing lines may be reconciled, and that it is the nature of the promise that is material in determining whether a contract claim is preempted. A leading treatise on copyright law, apparently seeking middle ground, reasons that “pre-emption should be found absent to the extent that a breach of contract cause of action alleges more than simply reproduction (or adaptation, distribution, etc.) of a copyrighted work.” (1 Nimmer On Copyright § 1.01 [B] [1] [a] [2010].) The cases, however, lack clarity on the issue of whether the promise on which the breach of contract claim is based is coextensive with the rights protected by the copyright law. In particular, clarification is needed on the circumstances under which the use of an idea, as opposed to the verbatim copying of the tangible expression in which the idea was presented to the defendant, should be treated as qualitatively different from copyright infringement.
In this case, the court need not finally determine whether plaintiffs allegation of a promise to pay for an idea embodied in her tangible book proposal is sufficient to avoid preemption, as the court has held above that plaintiffs complaint does not otherwise state a cause of action for breach of implied contract. Nor would it be appropriate to reach the issue on this motion as briefed. While the parties have acknowledged the conflict in authority over whether a promise to pay is sufficient, they have not undertaken close analysis of the reasoning of the conflicting authorities, and have not argued the rationale for preferring one line of cases over the other. Nor have they addressed New York case law on the preemption issue. (See e.g. Meyers v Waverly Fabrics, Div. of Schumacher & Co., 65 NY2d 75 [1985]; Morris v Putnam Berkley, Inc., 259 AD2d 425 [1st Dept 1999].)
The law governing preemption of state misappropriation or unfair competition claims does not reflect the same lack of uniformity as that governing preemption of contract claims. It is well settled that misappropriation claims grounded solely in the use of a plaintiffs protected expression are preempted by the Copyright Act. (E.g. Katz Dochrermann & Epstein, Inc., *752 1999 WL 179603, *4, 1999 US Dist LEXIS 3971, *10 [holding, on the alleged facts, that there was no qualitative distinction between “state law protection against misappropriation of the unexpressed idea, and federal protection against misappropriation of the idea as expressed”]; Computer Assoc., 982 F2d at 717.) Plaintiffs misappropriation claim, if properly pleaded, would thus clearly be preempted.
Defamation Claim against Seinfeld
The complaint alleges that Seinfeld defamed Lapine by accusing Lapine of making “a false and opportunistic claim of plagiarism against Seinfeld’s wife.” (Complaint 1i 47.) More particularly, plaintiff alleges that “to deflect attention from the mounting public accusations of plagiarism against his wife, defendant Jerry Seinfeld used an appearance on the immensely popular CBS television program, Late Show With David Letterman, to launch a malicious, premeditated and knowingly false and defamatory attack,” and that “Seinfeld used his appearance on [E! News] again to make outrageously false statements about Lapine’s mental health.” (Id. U1i 33, 39.) The allegedly defamatory statements include calling plaintiff “a wacko” and “a nut” (id. at 34-36, 39), stating that plaintiff was “angry and hysterical,” making the point that Lapine “was a mentally unhinged stalker of the Seinfelds,” and observing that “many of the three-name people do become assassins.” (See id. U1Í 35-36.)
It is well settled that “expressions of an opinion ‘false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions.’ ” (Steinhilber v Alphonse, 68 NY2d 283, 286 [1986], quoting Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 380 [1977], cert denied 434 US 969 [1977].) It is further settled that whether a statement expresses fact or opinion is a question of law for the court. (Id. at 290.) The determination as to whether a statement is fact or opinion must be based on “what the average person hearing or reading the communication would take it to mean.” (Id.) Thus, “[t]he dispositive inquiry ... is ‘whether a reasonable [viewer] could have concluded that [the statements were] conveying facts about the plaintiff.’ ” (Gross v New York Times Co., 82 NY2d 146, 152 [1993], quoting 600 W. 115th St. Corp. v Von Gutfeld, 80 NY2d 130, 139 [1992], cert denied 508 US 910 [1993]; accord Mann v Abel, 10 NY3d 271, 276 [2008], cert denied 555 US —, 129 S Ct 1315 [2009].) The inquiry generally entails an examination of
“(1) whether the specific language in issue has a precise meaning which is readily understood; (2) *753 whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.” (Gross, 82 NY2d at 153 [internal quotation marks and citations omitted]; accord Mann, 10 NY3d at 276; Guerrero v Carva, 10 AD3d 105, 111-112 [1st Dept 2004].)
The court must examine “the content of the whole communication as well as its tone and its apparent purpose.” (Steinhilber, 68 NY2d at 293; accord Immuno AG. v Moor-Jankowski, 77 NY2d 235, 254 [1991], cert denied 500 US 954 [1991].)
Further,
“in determining whether a particular communication is actionable, [the courts] continue to recognize and utilize the important distinction between a statement of opinion that implies a basis in facts which are not disclosed to the reader or listener, and a statement of opinion that is accompanied by a recitation of the facts on which it is based.” (Gross, 82 NY2d at 153 [citations omitted].)
The latter are ordinarily not actionable because “a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture.” (Id. at 154.) The Court of Appeals
“has cautioned, however, that ‘sifting through a communication for the purpose of isolating and identifying assertions of fact’ should not be the central inquiry. Instead, courts ‘should look to the over-all context in which the assertions were made and determine on that basis “whether the reasonable reader [or viewer] would have believed that the challenged statements were conveying facts about the libel plaintiff.” ’ ” (Guerrero, 10 AD3d at 112, quoting Brian v Richardson, 87 NY2d 46, 51 [1995], quoting Immuno AG., 77 NY2d at 254 [citation omitted].)
Applying these standards, the court finds it inconceivable that a reasonable viewer would have believed that Seinfeld’s statements were conveying facts about Lapine. In opposing Seinfeld’s motion to dismiss, plaintiff does not rely on the allegations of the complaint that Seinfeld characterized her as a *754 stalker, assassin, or mentally ill person. Nor could plaintiff prevail on a defamation claim based on such allegations, as the transcripts and recordings of the programs on which Seinfeld appeared clearly demonstrate that he did not make the statements that the complaint attributes to him.[7] In opposing the motion to dismiss, plaintiff also does not argue that the defamation claim may be established on the basis of Seinfeld’s description of plaintiff as a wacko or nut job — expressions of “rhetorical hyperbole” which “negate the impression” that the speaker is conveying facts. (See generally Immuno AG., 77 NY2d at 244.)
Rather, plaintiff rests her defamation cause of action on the claim that Seinfeld defamed her by conveying the “unmistakable message” to television viewers “that Lapine had fabricated opportunistic allegations of plagiarism against his wife.” (Plaintiffs mem of law in opposition at 1, 6.) Assessment of this defamation claim requires consideration of both the context in which the statements were made and their content. Seinfeld, a well-known comedian, made the statements in question primarily on the Letterman show, a late-night entertainment program, during a comedic interchange between Seinfeld and Letterman. The interchange was repeatedly punctuated by laughter from the audience, and covered a number of topics besides Lapine’s claim of plagiarism, including Seinfeld’s promotion of his new movie and anecdotes about parenting. In describing what he termed the “cookbook controversy,” Seinfeld related the circumstances that led to his wife’s publication of her cookbook, then stated that there was a wacko (unnamed) who had a similar book and who, sensing that this could be her “wacko moment,” accused his wife as follows: “You stole my mushed-up *755 carrots. You can’t put mushed-up carrots in a casserole. I put mushed-up carrots in the casserole . . . .” Seinfeld concluded: “It’s vegetable plagiarism.” (Transcript, plaintiffs exhibit I.)[8]
*756 Plaintiff correctly argues that “humor and comedy have never been held to be entitled to absolute or categorical 1st Amendment protection.” (Frank v National Broadcasting Co., 119 AD2d 252, 257 [2d Dept 1986], lv granted 69 NY2d 607 [1987], appeal withdrawn 70 NY2d 641 [1987].) Here, however, Seinfeld’s statements are protected not because they were made in a comedic context nor because they are themselves comedic but because, as the context and content demonstrate, they are not defamatory as a matter of law. Seinfeld’s statements disparage Lapine’s claim of plagiarism as false or baseless or, more colloquially, as wacky. As statements of opinion about the lack of merit of plaintiffs claims, they are not actionable. (See El-Amine v Avon Prods., 293 AD2d 283, 283 [1st Dept 2002] [holding that “statement by defendant to the media that plaintiff’s claim against it was without merit constituted mere opinion, and was therefore nonactionable”]; Gotbetter v Dow Jones & Co., 259 AD2d 335, 335 [1st Dept 1999] [holding that statement that plaintiffs suit was “baseless” constituted opinion].) Nor are Seinfeld’s statements rendered actionable even if construed as charging Lapine with “opportunism.” (See Costanza v Seinfeld, 279 AD2d 255 [1st Dept 2001].) If the law were to the contrary, the protection of the First Amendment would be unacceptably denied to persons who publicly defend themselves against what they believe to be baseless public charges or lawsuits.
The court has considered plaintiffs remaining contentions and finds them to be without merit.
It is accordingly hereby ordered that plaintiffs complaint is dismissed with prejudice.

. In her brief on this motion, plaintiff describes her claim as follows: “Deceptively Delicious copied Lapine’s cookbook idea of promoting sneaky techniques and deception to trick children into eating healthier food, and teaching a simple system to implement the strategy, by preparing vegetable purees in advance for storage and use in a variety of recipes specially designed for the purpose of concealing vegetables in children’s favorite foods.” (Plaintiffs mem of law in opposition at 5.)
Throughout this opinion, plaintiffs idea for the cookbook, and her ideas for the techniques and recipes necessary to implement the cookbook idea, are collectively referred to as plaintiffs “idea.”

. In fact, comparison of The Sneaky Chef and Deceptively Delicious shows that the recipes for purees are different in the two books and that, while the books contain recipes for many of the same dishes, such recipes are also different.

. Robbins v Cooper Assoc. (14 NY2d 913 [1964]), on which plaintiff relies, is not to the contrary. There, the Court held that where the defendant took the plaintiffs property under circumstances in which the parties negotiated for the conveyance of the property and intended payment for its use, but did not reach agreement upon the terms, the defendant was obligated to pay plaintiff its reasonable value. Here, in contrast, the complaint does not allege facts showing an intent by defendant to pay plaintiff for the use of her ideas. Nor does it allege facts showing the existence of industry custom that would establish a basis for fixing compensation where the publisher uses an idea in a manuscript.
The court notes that plaintiff does not seek leave to replead to allege industry custom in order to supply the price term of the alleged contract. Indeed, plaintiff makes no showing whatsoever on this motion that the publishing industry is interested in purchasing ideas for (cook)books, as opposed to saleable manuscripts expressing the ideas.

. Plaintiffs second cause of action is denominated “misappropriation and unfair competition.” It has been noted that New York courts have not explicitly defined the scope of the tort of unfair competition. (Louis Capital Mkts., L.P. v REFCO Group Ltd., LLC, 9 Misc 3d 283, 288 [Sup Ct, NY County 2005].) However, the courts have cited the “misappropriation of another’s commercial advantage as a cornerstone of the tort.” (Ruder & Finn v Seaboard Sur. Co., 52 NY2d 663, 671 [1981].) Unfair competition also requires a showing of bad faith. (Abe’s Rooms, Inc. v Space Hunters, Inc., 38 AD3d 690, 692 [2d Dept 2007]; Saratoga Vichy Spring Co., Inc. v Lehman, 625 F2d 1037, 1044 [2d Cir 1980] [applying New York law].) Plaintiff does not distinguish between misappropriation and unfair competition, and the cases sometimes refer to claims for misappropriation of ideas without reference to the tort of unfair competition. (See e.g. Oasis Music v 900 U.S.A., 161 Misc 2d 627 [1994].) Plaintiffs claims for misappropriation and unfair competition will therefore be treated as interchangeable and referred to, for purposes of convenience, as misappropriation.

. In American Bus. Training Inc. (50 AD3d at 223), both breach of implied contract and misappropriation causes of action were pleaded. The Court noted the plaintiffs claim that its idea was novel both in general and to the user, but found, without distinguishing between or discussing the two novelty standards, that the plaintiff failed to sustain its burden of establishing novelty. In MP Innovations, Inc. v Atlantic Horizon Intl., Inc. (72 AD3d 571 [1st Dept 2010]), a recent case alleging an implied contract to pay for a marketing concept, this department did not mention the two novelty standards.

. These authorities are annexed to defendant’s affirmation in support as exhibit 10.

. For example, on the Letterman show, Seinfeld’s use of the word “assassin” during his discussion of the “cookbook controversy” with Lapine was as follows:
“LETTERMAN: There — exactly. And what does this woman think; that she’s the first one to prepare and eat food?
“MR SEINFELD: I — I guess so. I — and I’m more upset — we’re sorry that she is, you know, angry and hysterical and — because she’s a three-named woman, which is what concerns me. She has three names. And you know if you read history, many of the three-named people do become assassins.
“LETTERMAN: Yeah. Now—
“MR SEINFELD: Mark David Chapman and, you know, James Earl Ray. So that’s my concern.”
Plainly, no viewer could have regarded this statement as an accusation that plaintiff was a would-be assassin or in any way dangerous.

. A central part of the exchange was as follows:
“MR SEINFELD: So she [my wife] makes the cookbook. Everybody is happy. It does well: seemingly an innocent sequence of events. Now you know, having a career in show business, one of the fun facts of celebrity life is wackos will wait in the woodwork to pop out at certain moments of your life to inject a little adrenaline into your Ufe experience.
“LETTERMAN: Just a little tap, just to get your attention.
“MR SEINFELD: Yes.
“LETTERMAN: Yeah.
“MR SEINFELD: I have wackos. You have had wackos.
“LETTERMAN: Yeah.
“MR SEINFELD: I believe your wackos are very well documented.
“LETTERMAN: Yeah. Oh yes, that’s — that’s one good thing; we got all the paperwork.
“MR SEINFELD: Now if you’re any good as a woodwork wacko, you are patient. You wait. You pick your moment and then you spring out and go wacko. So there’s another woman who had another cookbook . . .
“LETTERMAN: Oh.
“MR SEINFELD: . . . and it was a similar kind of thing with the food and the vegetables in the food. And my wife never saw the book, read the book; used the book. But the books—
“letterman: She knew nothing about it.
“MR SEINFELD: Didn’t know anything about it. But the books came out at the same time. So this woman says, ‘I sense this could be my wacko moment.’
“LETTERMAN: Ah, oh.
“MR SEINFELD: So she comes out and she says — and she accuses my wife. She says ‘You stole my mushed-up carrots. You can’t put mushed-up carrots in a casserole. I put mushed-up carrots in the casserole.’
“LETTERMAN: That’s ridiculous.
“MR SEINFELD: ‘It’s vegetable plagiarism.’
“LETTERMAN: That’s ridiculous.
“MR SEINFELD: I mean, this is what — I’m telling you, this is what happened.
“LETTERMAN: First of all, with all deference and respect to your wife, people have been mashing up vegetables since the beginning of time.
“MR SEINFELD: Apparently not, Mr. Letterman. So my wife, the do-gooder, who gets mad at me—
“LETTERMAN: Gets mad at you for this.
“MR SEINFELD: She gets mad at me — no, if I take two newspapers . . .
*756 “LETTEBMAN: I see.
“MR SEINFELD: . . . out of the USA Today box because I don’t think they can possibly sell all those papers, she is now accused of a Watergate-style break in . . .
“LETTEBMAN: Oh, god.
“MR SEINFELD: ... at Harper Collins because how else could she have known chickpeas and cauliflower? Clearly there is some foul play.” (Transcript, plaintiffs exhibit I.)
Seinfeld’s statements on E! News were much briefer. Similarly, they referred to Lapine (unnamed) as a “nut job” who “comes outta the woodwork.” “She thinks she invented vegetables [laughter]. And she’s accusing my wife of stealing her mushed-up carrots.” (Transcript, plaintiffs exhibit J.)